[Civ. No. 16524.    First Dist., Div. One.    Feb. 24, 1956.]

THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Appellant, v. STATE BOARD OF EQUALIZATION et al., Respondents.

Robert W. Walker, Robert B. Curtiss, L. W. Butterfield, Peart, Baraty & Hassard and George A. Smith for Appellant.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman and Eugene B. Jacobs, Deputy Attorneys General, for Respondents.

PETERS, P. J.—The plaintiff brought this action to secure a refund of $32,348.90 in use taxes and $9,129.86 interest paid by it under protest on 17 switch engines claimed by plaintiff to be exempt from the tax. The case was submitted to the trial court upon a written stipulation of facts. Judgment was entered in favor of defendants. Plaintiff appeals.

The question presented is whether or not the transactions about to be described were subject to the use tax. (Rev. & Tax. Code, §§ 6201-6246.)

The plaintiff is a Kansas corporation qualified to do business in California. It operates a railroad which transports passengers and freight in and between 12 different states, including California. In 1942 the plaintiff began to purchase 93 switch engines for use in its terminals throughout its system. Pursuant to this program, between January 1, 1943, and December 1, 1945, the engines were purchased by plaintiff and delivered to it in Iowa. The use tax here involved was levied on the purchase price of 17 of these engines that were permanently assigned to and used in California. When these 93 engines were ordered, and at the time they were delivered to plaintiff in Iowa, "plaintiff had not determined at what point or points on its system any particular engines would be used, but plaintiff had purchased said engines for use in its yards upon its railroad at any point or points, in the State of California or elsewhere, whenever and wherever any or all of said engines should be needed to carry on the business of plaintiff." When the engines were purchased and delivered "plaintiff knew that some of said engines were needed for its operations in the State of California."

The 93 engines, when delivered at Shopton, Iowa, where the plaintiff maintains shops, were adjusted and made ready for use, and thereafter placed in "revenue service"* at Shopton to determine if they were ready for operation. After testing at Shopton, the engines were assigned to revenue service at a point where a shortage of power for yard work existed. At some points such shortages were temporary, and, when the temporary shortage ended, the engines were moved to another temporary assignment until they reached their point of permanent assignment. This point for the 17 engines here involved was California. All but one of the 17 engines, after servicing and testing at Shopton, were moved to various places on plaintiff's railroad outside of California, and placed in service in yard work. The one exception was moved directly to California from Shopton, without being used in revenue service at intervening out-of-state points. The times spent by the 17 engines in revenue service outside of California, including the time spent at Shopton, before the engines were sent to California, ranged from 1 to 79 days, averaging about 43 days. The life expectancy of such engines is 25 years.

Each of these 17 engines was moved from the point where it was last engaged in temporary revenue service to its assigned point in California "dead in train," that is, by being coupled into a freight train and hauled on an interstate journey into California. This method of transportation was used because switch engines are not intended to haul trains, and because it was cheaper to haul them "dead in train" than to transport them under their own power.

The 17 engines have remained in California since they first entered the state. Since their arrival in California the engines have been engaged in interstate and intrastate commerce. The parties describe the relative interstate and intrastate work of such engines at some length. It can fairly be said that the greater portion of the work of such engines was in interstate commerce, although a small proportion of the work was exclusively in intrastate commerce. These engines also engaged in some nonrevenue service, that is, in the making up of work trains, etc.

It is an admitted fact that no sale, use or excise tax has been paid to any other state with respect to the 17 engines.

---

*Which is defined at great length by the parties, but need not be defined at length in this opinion. Suffice it to say that the phrase means that the engines were engaged in switching operations of trains or cars engaged primarily in interstate commerce.

In January of 1949 the defendant notified plaintiff that it claimed that there was owing to it $32,348.90 plus $9,129.86 interest "with respect to the storage, use or other consumption, during the quarterly periods beginning January 1, 1943, and ending December 31, 1945, in the State of California, of 17 diesel electric switch engines which were purchased by plaintiffs outside this State and brought into this State by plaintiff." Plaintiff paid the taxes and then filed a claim for refund, claiming that the engines were exempt from the tax because used in interstate commerce. The precise allegations of the claim are:

"(1) That each and all of said seventeen Diesel switch engines were purchased for use in interstate commerce, were actually placed in use in interstate commerce prior to their entry into this state, and were thereafter used continuously in interstate commerce.

"(2) That the movement of said engines to California from the points outside of California where they had previously been engaged in interstate commerce, itself constitutes interstate commerce, because they were moving interstate from said points to California and transporting themselves as a shipment in interstate commerce, so that there never was a taxable moment in which said engines, or any of them were used, stored or otherwise consumed in the State of California except as instrumentalities of interstate commerce."

The trial court adopted the stipulated facts as part of its findings, and also found "as inferences drawn by the Court from the stipulated facts and as additional findings" that "the diesel electric switch engines with respect to which the use tax was assessed and collected by the State of California were purchased by plaintiff from a retailer for storage and use in the State of California and were stored and used by plaintiff in the State of California." The court also found that "there was a period of time after the switch engines arrived in the State of California when they were stored and used by plaintiff exclusively in intrastate commerce." The court concluded that the assessment of the tax had been duly and regularly made and that "there was an intrastate storage and use of the switch engines in the State of California to which the use tax validly applied." Plaintiff appeals from the judgment based on such findings and conclusions.

The basic contention of appellant is that the challenged tax has been imposed on the use of engines in interstate commerce and therefore violative of the commerce clause of the United

States Constitution. The California Use Tax expressly exempts from its operation any tax prohibited by the Constitution of the United States.* Respondent board has adopted Rule 55 (Cal. Admin. Code, § 2015, tit. 18) to give effect to this exemption. That rule provides: "The use tax applies with respect to any tangible personal property purchased for storage, use or other consumption in this State, the sale of which is exempt from sales tax under this rule . . . except property purchased for use in interstate or foreign commerce, placed in use in interstate or foreign commerce prior to its entry into this State, and thereafter used continuously in interstate or foreign commerce."**

The use tax provides that "Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax." (Rev. & Tax. Code, § 6202.) Section 6241 creates a statutory presumption that "tangible personal property sold by any person for delivery in this State is sold for storage, use, or other consumption in this State, until the contrary is established." Section 6246 creates a statutory presumption that "tangible personal property shipped or brought to this State by the purchaser was purchased from a retailer on or after July 1, 1935, for storage, use, or other consumption in this State."

The general purpose, nature and constitutionality of this tax have long been determined and need not be discussed. (*Douglas Aircraft Co., Inc.* v. *Johnson,* 13 Cal.2d 545 [90 P.2d 572]; *Anders* v. *State Board of Equalization,* 82 Cal. App.2d 88 [185 P.2d 883]; *Brandtjen & Kluge, Inc.* v. *Fincher,* 44 Cal.App.2d Supp. 939 [111 P.2d 979].)

Appellants contend that the tax is imposed on the purchase price of property in interstate commerce because these engines were engaged in interstate use before they entered the state, and such use was not interrupted or terminated when the

---

*Section 6352 of the Revenue and Taxation Code provides: "There are exempted from the taxes imposed by this part the gross receipts from the sale of and the storage, use, or other consumption in this State of tangible personal property the gross receipts from the sale of which, or the storage, use, or other consumption of which, this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this State."

**Of course, whatever may be the proper interpretation of this rule, the rule cannot operate to exempt from the use tax property not exempt under the statute or required to be exempted under the United States Constitution. (*La Societe Francaise* v. *California Emp. Com.,* 56 Cal. App.2d 534 [133 P.2d 44]; *Goodwill Industries* v. *County of Los Angeles,* 117 Cal.App.2d 19 [254 P.2d 877].)

engines were transferred or used in California. Respondents, on the other hand, contend that there was a "taxable moment" after the journey of the switch engines had ended and before they were placed in interstate commerce in this state that justifies the tax. The answer to these contentions depends upon whether the rules announced in *Southern Pac. Co.* v. *Gallagher,* 306 U. S. 167 [59 S.Ct. 389, 83 L.Ed. 586] and *Pacific Tel Co.* v. *Gallagher,* 306 U. S. 182 [59 S.Ct. 396, 83 L.Ed. 595], or the rules announced in *Union Pac. R. Co.* v. *Utah State Tax Com.,* 110 Utah 99 [169 P.2d 804], should control this case.

In *Southern Pac. Co.* v. *Gallagher, supra,* the United States Supreme Court upheld the imposition of the California use tax upon "tangible personal property, bought outside of the state by the Southern Pacific Company, an interstate railroad, and installed on importation, or kept available for use, as a part of its transportation facilities." (P. 170.) The property consisted of rails, equipment, machinery, tools and office supplies. The court described the property as follows (p. 173) : "Few, if any, of the supplies are stored for long term needs. Storage is merely incidental to protection until use, as office supplies in a closet or an extra frog at a section tool house. For construction or reconstruction upon a large scale, special orders are given and arrangements made, so that the material is fabricated for a particular use in the transportation facilities, shipped to its California destination and installed upon arrival. To avoid delay and cost the movement from loading to final placement is as nearly continuous as managerial efficiency can contrive." The court then cited the rule that a tax upon the privilege of operating in interstate commerce is invalid, but stated that use and storage as defined in the California act are taxable intrastate events, separate and apart from interstate commerce. After discussing several cases the court continued with its discussion of the problem as follows (p. 176) : "The principle illustrated by the *Helson* case [279 U. S. 245 (49 S.Ct. 279, 73 L.Ed. 683)] forbids a tax upon commerce or consumption in commerce. The *Wallace* case, [288 U. S. 249 (53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191)] and precedents analogous to it, permit state taxation of events preliminary to interstate commerce. The validity of any application of a taxing act depends upon a classification of the facts in the light of these theories. In the present case some of the articles were ordered out of the state under specification suitable only for utilization in the trans-

portation facilities and installed immediately on arrival at the California destination. If articles so handled are deemed to have reached the end of their interstate transit upon 'use or storage,' no further inquiry is necessary as to the rest of the articles which are subjected to a retention, by comparison, farther removed from interstate commerce. We think there was a taxable moment when the former had reached the end of their interstate transportation and had not begun to be consumed in interstate operation. At that moment, the tax on storage and use—retention and exercise of a right of ownership, respectively—was effective. The interstate movement was complete. The interstate consumption had not begun. . . . 'Practical continuity' does not always make an act a part of interstate commerce. This conclusion does not give preponderance to the language of the state act over its effect on commerce. State taxes upon national commerce or its incidents do not depend for their validity upon a choice of words but upon the choice of the thing taxed. . . . The prohibited burden upon commerce between the states is created by state interference with that commerce, a matter distinct from the expense of doing business. A discrimination against it, or a tax on its operations as such, is an interference. A tax on property or upon a taxable event in the state, apart from operation, does not interfere. This is a practical adjustment of the right of the state to revenue from the instrumentalities of commerce and the obligation of the state to leave the regulation of interstate and foreign commerce to the Congress.''

In the companion case of *Pacific Tel. Co.* v. *Gallagher*, 306 U. S. 182 [59 S.Ct. 396, 83 L.Ed. 595], the facts were as follows (p. 186):

''The appellant, a California corporation, operates a telephone and telegraph system in interstate and intrastate commerce. The same plant, facilities and organization are devoted to both interstate and intrastate business. In the necessary operation, maintenance and repair of its system, the appellant purchases outside California large amounts of equipment, apparatus, materials and supplies which are shipped to it in interstate commerce at various points within the state. The tangible personal property which the appellees threaten to tax is of two general classes: specific order and stand-by equipment. . . .

''The specific order equipment is shipped to the appellant

at the place of use. Its representative receipts for the goods at the dock or breaks the seal of the railroad car, and its employees unload the goods from the dock or car into its trucks. In most instances the trucks are driven directly to the building where the equipment is to be installed. . . . There is no holding in warehouses. The stand-by supplies which constitute a reserve to meet current requirements are replenished by monthly orders. The appellant's trucks pick them up at the dock or railroad depot and carry them to storage places at points on the system suitable for prompt distribution.''

On these facts the court concluded (p. 187) : ''The appellant exercises two rights of ownership in California—retention and installation—after the termination of the interstate shipment and before the use or consumption on its mixed interstate and intrastate telephone system. We see no material distinction between the contentions of the appellant and those disposed of in *Southern Pac. Co.* v. *Gallagher, ante,* p. 167.''

The Gallagher cases have been consistently followed. In *Curry* v. *United States,* 314 U. S. 14 [62 S.Ct. 48, 86 L.Ed. 9], an Alabama use tax was upheld on goods purchased by a contractor out of Alabama and brought into the state to be used on a federal cost plus contract. The material was shipped directly to the camp site where it was installed on the federal project. On the authority of the Gallagher cases it was held that the tax was not one levied on the federal government, but one upon storage and use by the contractor in Alabama. (See also *Oklahoma Tax Com.* v. *Stanolind Pipe Line Co.,* 113 F.2d 853; *Natural Gas Pipeline Co.* v. *State Com. of Rev. & Tax.,* 163 Kan. 458 [183 P.2d 234] ; *Mitchell Pub. Co.* v. *Wilder,* 74 S.D. 343 [52 N.W.2d 732] ; *Avco Mfg. Corp.* v. *Connelly,* 19 Conn.Supp. 323 [113 A.2d 364].)

*Mavar Shrimp & Oyster Co.* v. *Stone,* 221 Miss. 519 [73 So.2d 109], is a rather typical case. There the taxpayer was a canner. Ninety-five per cent of the raw products used by the taxpayer were procured out of Mississippi. The taxpayer used its own boats to import these raw fish products. Repair parts for these boats were purchased outside the state, and were shipped to a wharf in the state where they were immediately placed on the boat in need of repair. Mississippi attempted to impose a use tax on these repair parts. It was held that the tax upon the ''using, storing or consuming'' of tangible personal property within the state was collectible. The court, in so holding, stated (p. 111 [73 So.2d]) : ''In the

instant case, the purchased articles were retained in Mississippi upon their delivery, at least momentarily, and the appellant exercised its right of ownership of the articles, by installing them in boats of its choosing. The articles purchased by appellant and handled in the aforesaid manner reached the end of their interstate transit upon 'use or storage' in this State, before they began to be utilized in interstate operations by appellant. Upon delivery of the articles to the wharf at Biloxi, Mississippi, by the common carrier by which they were shipped, the interstate movement of the articles was completed. Beyond question, regardless of the speed with which the articles were installed upon the boats, the interstate consumption of the articles had not begun until they had been installed in their proper place in the boats.''

California has followed the rule announced in the Gallagher cases. In *Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal.2d 162 [119 P.2d 945], there was involved the application of the use tax to a foreign corporation engaged in the sale of steel tanks. The company manufactured the tanks in another state and then shipped them ''knocked down'' to their customers in California. The Supreme Court of California held that the tax applied to the raw materials purchased outside the state used in the tanks assembled in this state. In so holding the court used the following language (p. 170) :

''In the instant case the tax was levied on the storage and use of materials which were purchased and fabricated into the tank parts, that storage and use consisting of the time after the materials had arrived and while they were waiting assembly and erection by plaintiff, and the subsequent installation and erection thereof. The interstate transit had ended when the tank parts arrived at their destination near and/or adjoining the customer's premises and awaited assembly insofar as their being subject to the tax was concerned. That was the commencement of the taxable moment; that was the taxable intrastate event which occurred after the interstate transit had ceased.

''Plaintiff endeavors to distinguish the Gallagher cases on several grounds. It asserts that in those cases the purchaser installed the equipment for itself, not as a part of a transaction with another as in the case at bar. But as we have pointed out the plaintiff did install the equipment for itself, that is, the erection of the tank which was in compliance with its contractual obligation so to do. We see no valid distinction between the case at bar and the Gallagher cases where the

installation by the Southern Pacific Company of the equipment was made immediately upon its arrival in interstate commerce and immediately upon such installation was used in its interstate activities. Nor does the claim that there were two transactions in the Gallagher cases, namely, the shipment in interstate commerce of the equipment into California followed by its installation and consumption in interstate commerce, while in the case at bar there is only one continuous transaction, namely, the fulfillment of an order for a tank including its final erection. The interstate shipment had come to an end no less in the case at bar than it had in the Gallagher cases. While it is true that it was stipulated that the requirement in plaintiff's contracts for tanks that they be assembled and installed was essentially connected with the contract and inhered in it, the purchase out of California and the shipment here of equipment and the consumption thereof in interstate commerce in the Gallagher cases was no less a continuing and closely integrated operation. The consumption of the equipment in interstate commerce was an essential and necessary part of and inhered in the entire transaction. The whole plan of the shipment of the equipment was that it be immediately consumed in interstate commerce. No shipment would have been made unless it was to be used in interstate commerce." (See also *Atchison etc. Ry. Co.* v. *State Board of Equalization,* 131 Cal. App.2d 677 [281 P.2d 99].)

Now how do the facts in the instant case compare with those involved in the Gallagher cases? In the Gallagher cases the goods were ordered outside California for use in California in interstate commerce. In the instant case the appellant ordered 93 engines outside the state, knowing that some of them were destined for use in California. Ultimately, 17 of the engines were allocated to such use. In the Gallagher cases, when the parts were delivered to the taxpayer, they were shipped in interstate commerce to California. In the instant case the engines were transferred "dead in train," that is, on their own wheels but not in operation, to California. That is comparable to being shipped in interstate commerce.

The only distinguishing factor between this case and the Gallagher cases is that in the latter cases the parts were shipped to California without being used prior to shipment. In the instant case the 17 engines were first inspected at Shopton, Iowa, and then placed in temporary, emergency

use in interstate commerce before being transported to their ultimate intended destination, California. It is appellant's position that this factor serves to distinguish and make inapplicable to the instant case the rule of the Gallagher cases.

This conclusion is reached by the following reasoning: It is argued that, because the property involved in the Gallagher cases had not, before being sent to California, been used in interstate commerce, the tax there imposed was on "events preliminary to interstate use or consumption." But in the instant case, so it is argued, the 17 engines were used as instrumentalities of interstate commerce before coming to California and were never withdrawn from such commerce. Therefore, there was no intrastate consumption or use, and therefore no "taxable moment" when the engines were not in interstate commerce. The journey from out of the state into California, it is contended, did not change the already exempt status of the engines as instrumentalities of interstate transportation. In support of these conclusions appellant cites *Union Pac. R. Co.* v. *Utah State Tax Com.*, 110 Utah 99 [169 P.2d 804]. The factual situation there involved does resemble the one here involved in many respects. There Utah assessed a use tax on eight engines purchased by the railroad and used in Nebraska in the switching and hauling of both intra and interstate trains. Some undefined time later, the opinion merely stating "subsequently," these engines were transferred to Utah under their own power, where they were inspected and repaired and then placed in interstate service. The court reversed the tax commission, and held that the engines had been in interstate commerce and were at no time removed from it. Therefore, said the court, no "taxable moment" ever occurred in Utah. One of the concurring opinions attempted to distinguish the Gallagher cases as follows (p. 807): "There the materials and appliances came into the state of California merely as freight, they were not then being used or consumed as instrumentalities in interstate commerce, but merely were being hauled as freight in an interstate movement. . . . Here these engines entered this state installed and equipped and being used and consumed in interstate commerce. The fact that there was a short period of time after they entered this state during which they were not actively engaged in or being used and consumed in interstate commerce because they were temporarily standing still and inactive does not constitute a withdrawal from interstate commerce."

There are a few other state cases holding that similar transactions are not taxable. (*Pacific Tel. & Tel. Co.* v. *Henneford*, 195 Wash. 553 [81 P.2d 786], decided before the Gallagher cases; *Northern Pac. Ry. Co.* v. *Henneford*, 9 Wn.2d 18 [113 P.2d 545], decided largely upon the restrictive language of the Washington statute; *Interstate Oil Pipe Line Co.* v. *Stone*, 203 Miss. 715 [35 So.2d 73] (aff. 337 U.S. 662 [69 S.Ct. 1264, 93 L.Ed. 1613]), decided upon an express provision of the Mississippi statute; see also *Southern Pac. Co.* v. *Utah Tax Com.*, 106 Utah 451 [150 P.2d 110].)

It must be conceded that in many ways the Union Pacific case is quite similar to the instant one. One difference is that in the Utah case we only know that the engines were first used in Nebraska, and, at some undefined date, "subsequently" removed to Utah. If that means that the engines were purchased for use in and used in Nebraska, and later the railroad decided to transfer them to Utah, the case differs from the instant one. In our case some undisclosed number of engines were intended for use in California but temporarily placed in emergency use in interstate commerce elsewhere before being shipped to California. This is an important distinction. ▇▇▇ As Justice Traynor, then a professor of law, stated in 24 California Law Review 175, 176: "It is the intent of the use tax merely to supplement the sales tax by imposing upon those subject to it a tax burden equivalent to that of the sales tax with the same specific exemptions in each case. The act accordingly limits the tax to the '*use . . .* of property *purchased for use . . .*' within the state. Problems requiring administrative interpretation must be analyzed in the light of this double condition. Circumstances might compel, for example, the use of property within the state not intended for such use at the time of purchase, and previously used elsewhere. Thus, a family moving into California with furniture it had used for several years would clearly be exempt from the tax. Cases can arise, however, where a formal use elsewhere might disguise an actual intent to use within the state the property purchased. For the most part such an intent would reveal itself in the circumstances of the purchase and the subsequent use of the property. There could be little doubt that the use tax would apply to the use of an automobile purchased in Nevada by a California resident and registered in California shortly thereafter. Since the variety of possible situations could hardly be covered by

a rigid rule or regulation, doubtful cases must be submitted to administrative interpretation.''

In the instant case the trial court wrote an opinion exhaustively and ably discussing the various problems presented. This problem of interstate use prior to transfer to California was discussed at some length. The court came to the conclusion that the out-of-state use was a mere ''formal'' use and did not serve to change the rule of the Gallagher cases. The court, speaking through the Hon. Melvyn I. Cronin, stated: ''. . . the Supreme Court of the United States has approved the carving out of particular phases of an integral economic process, the labelling of them as 'local,' and sustained state taxation in the face of the argument that the tax violated the commerce clause. In such cases the Supreme Court has the last word.

''Would the rule of *Southern Pacific* v. *Gallagher* be any different if there had been a formal period of prior interstate use outside the state? I think not. Over-simplifying the problem, one might imagine the railroad to be a small boy and an instrumentality of inter-state commerce a hoop. Could the small boy then say, 'If I roll my new hoop through Kansas and New Mexico I won't have to pay a tax on it if I play with it in California, which is where I intend to use it personally.' Under the law as now interpreted, the little boy and the railroad would be wrong. . . .

''Accordingly, we are constrained to hold from reason and rule that there was a taxable period after the engines had been hauled into California and before they were actually placed in operations here, sufficient upon which to conclude there existed a genuine intra-state event upon which this tax was imposed; and that the property here involved was not used continuously in inter-state commerce.

''We are satisfied that the case at bar is controlled by the principles expressed in *Southern Pac. Co.* v. *Gallagher* and *Pacific Tel & Tel. Co.* v. *Gallagher.*''

This appears to us to be sound reasoning. In the instant case the interstate use outside the state was intended to be temporary and it was intended that such engines should be ultimately operated, used and consumed in California. After such formal out-of-state use the engines were placed in interstate transit. At the end of that transit, and before being placed in interstate operation, just as in the Gallagher cases, there was a period of time between the end of the transit and the beginning of use in California. During that

period there was a "storage" and "use" identical with those involved in the Gallagher cases. These were intrastate events and subject to state taxation, under the rule of the Gallagher cases. This conclusion makes it unnecessary to discuss the other points raised by counsel.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied March 23, 1956, and appellant's petition for a hearing by the Supreme Court was denied April 18, 1956.