[Civ. No. 20120. First Dist., Div. One. Nov. 20, 1962.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

784

George H. Koster and Bayley Kohlmeier for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Ernest P. Goodman, Deputy Attorney General, for Defendant and Respondent.

MOLINARI, J.—This is an appeal from a judgment in favor of the respondent (hereinafter referred to as the State) in an action by the appellant (hereinafter referred to as the Bank) for the recovery of $41,401.11, with interest, charged to and collected from the Bank by the State as use tax for the period from April 1, 1952, to March 31, 1955. The taxes involved were based upon purchases of specially printed checks by depositors of the Bank which taxes were charged against the Bank on the ground that the Bank was required to collect use taxes from the purchasers, and having failed to do so, became liable for the payment of taxes and interest thereon from its own funds. The Bank contested liability for the taxes, paid the taxes and interest under protest, filed a written claim for refund, and upon rejection of the claim, filed this action for recovery of the amounts so paid by it. The action was determined adversely to the Bank by the trial court. The cause was tried upon a written ''Stipulation of Facts,'' which was admitted in evidence as exhibit No. 1; the testimony of one witness, L. J. Tobey, an assistant vice-president of the Bank; and other documentary exhibits admitted at the trial.

## The Stipulated Facts

Pursuant to the written "Stipulation of Facts" filed in open court and also marked as an exhibit as aforesaid, the parties stipulated and agreed therein that either party could present other evidence which did not qualify, change or contradict the facts stipulated to, and that the court could find the facts stipulated to. The stipulated facts are essentially as follows:

The Bank is a national bank maintaining its principal place of business in San Francisco, California. During the period from April 1, 1952, to March 31, 1955, the Bank made available to its depositors checks on which the name and address of the depositor were printed. These were referred to as "personalized checks." The Bank displayed and distributed at its place of business literature with regard to personalized checks prepared by DeLuxe Check Printers, Inc. (hereinafter referred to as DeLuxe), a corporation organized under the laws of the State of Minnesota, which maintained its principal office in Chicago, Illinois, did not maintain an office or place of business in California and was not qualified to do business in California. Brochures describing these checks and containing an order blank provided by DeLuxe were on occasions transmitted to the customers of the Bank with their monthly bank statements. The orders for personalized checks could be mailed to the offices of the Bank and this practice was followed by some of the Bank's customers. The design and the statement of price in said brochure was changed during the period involved herein, but the wording of the order blank contained in said brochure remained the same throughout the entire period.

Depositors who desired to purchase personalized checks printed by DeLuxe completed the order form contained in said brochure by filling in the number of checks desired, the name and address to be printed thereon, special instructions, if any, signed the order, and then delivered the order to an employee of the Bank either in person or by mail. If the order was accepted by the Bank the order was then transcribed onto another order blank provided by DeLuxe, which contained space for three orders and which also provided duplicates for use as labels and as vouchers for the charge to the depositor. Said orders were then transmitted by the Bank to DeLuxe at the Chicago office of said corporation. The same form with appropriate notations was used regardless of whether the checks were to be mailed directly to the customer or mailed to the Bank's branch for delivery to the customer. The checks were printed

by DeLuxe pursuant to the orders, and when printed were mailed directly to the depositor or to the designated branch office of the Bank in accordance with the instructions of the depositor contained in the order. Printed checks mailed to the Bank were delivered by it to the depositor when he called for them at its branch office.

The order signed by the depositor authorized the Bank to charge the depositor's bank account with the Bank for the entire cost of the checks. During the period from April 1, 1952, to October 19, 1953, DeLuxe charged $1.30 for each book of 200 checks, plus 10 cents additional if the book of checks was mailed directly to the depositor. During the period from October 19, 1953, to March 31, 1955, DeLuxe charged $1.40 for each book of 200 checks, plus 10 cents additional if the book of checks was mailed directly to the depositor. An additional amount of five cents was added to the charge to the depositor for each book of 200 checks and said additional amount was retained by the Bank. Charges for personalized checks, including the amount retained by the Bank, were either collected by the Bank from the depositor or charged to his account at the time of acceptance of orders. In the Bank's statement sent to the depositor the amount so retained by the Bank was not separately stated.

The amount received from the depositor or charged to his account was credited to an account designated " 'Bancontrol: DeLuxe Check Printers, Inc.' " DeLuxe sent a monthly statement to the Bank's Accounting Department, Head Office, for the total charges at the rate charged by DeLuxe for all orders forwarded from all branches of the Bank during the period covered by the statement. Payment of the total amount shown on said monthly statements was made from the headquarters office of the Bank. The statement sent to the Bank by DeLuxe showed the charges which were allocable to each branch of the Bank. The amounts allocable to each branch were then charged to the various branches through the branch clearings and these amounts were entered on the books of the branch in the account titled " 'Expense' " through a debit entry. The branch verified the charges shown on the statement of DeLuxe by comparing them with copies of orders on file at the branch. Then, the full amount collected from the customers on the completed orders covered by the statement was subtracted from the account designated " 'Bancontrol: DeLuxe Check Printers, Inc.' " by means of a debit entry and such amount was credited to the account titled " 'Expense.' " The effect of the

above accounting entries was to fully offset the amount charged to expenses as a result of the billing from DeLuxe and also, to reduce the amounts in the account titled " 'Expense' " by an additional five cents per order of 200 checks. This amount of five cents per order which had originally been included in the credit to the Bancontrol Account represented the income received by the Bank on each order of 200 checks over and above the charges made by DeLuxe.

Each book of personalized checks contained a reorder blank. Said reorder blanks were completed by the depositor and delivered to the branch of the Bank either in person or by mail. The procedure followed by the Bank in transmitting reorders and payments to DeLuxe and charging the depositor's account was the same as that described above in the case of original orders.

During the period from April 1, 1952, to March 31, 1955, the total charges which the Bank made to the accounts of depositors who purchased said checks printed by DeLuxe during the said period, pursuant to the orders and procedure above described, amounted to $1,229,949.70. The Bank did not collect sales tax reimbursement from its customers who purchased personalized checks and did not pay sales tax with respect thereto, nor did it collect from the depositors who purchased such checks and transmit to the State use tax with respect to the purchase of such checks. The Bank did not report the purchases and distribution of personalized checks in a sales or use tax return.

The State, through its agents, examined the books and records of the Bank pertaining to the purchases of personalized checks by the Bank's depositors. At the termination of such examination, the State forwarded to the Bank a copy of "Report of Field Audit," and thereafter, on July 29, 1955, issued to the Bank a "Notice of Determination Under the Sales and Use Tax Law," which referred to said audit. Within the time provided by law the Bank filed with the State a "Petition for Redetermination of Sales and Use Tax." After oral hearing, the State issued to the Bank under date of February 8, 1956, a "Notice of Redetermination Under the Sales and Use Tax Law." The additional taxes shown on the "Field Audit Report" for the period April 1, 1947, to March 31, 1952, were abated by the State Board of Equalization by reason of the expiration of the statute of limitations. As the result of the receipt of said "Notice of Redetermination," the Bank paid the sum of $41,401.11 to the State, under written protest.

Thereafter the Bank filed with the State a written claim for the refund of said sum in the amount of $41,401.11, which claim was denied by the State.

The State did not make any determination of the tax measured by the cost of personalized checks against any of the purchasers of said checks.

It was further stipulated and agreed in said "Stipulation of Facts" that the exhibits attached thereto (A, B, C, D, E, F, G and H) and incorporated therein by reference were included for the sole purpose of describing the transactions referred to and not for the purpose of stipulation or agreement as to the truth of any statement contained in such exhibit. Several other exhibits were admitted at the trial subject to the same stipulation.

### Tobey's Testimony

Mr. Tobey testified substantially to the agreement entered into with DeLuxe and the procedures employed with regard to the personalized checks as set out in the "Stipulation of Facts." He also testified that the Bank did not derive a profit from the transactions because the cost of handling the orders exceeded the five cents' handling charge.

### The Trial Court's Findings

The trial court found that the facts were as stated in the said "Stipulation of Facts" which it adopted as its "Findings of Fact." It also made the following additional findings: "I The plaintiff sold the checks here involved to its customers. II The checks were sold for the customers' use and not for resale. III The contract for the purchase of the checks here involved was entered into between the customers and the plaintiff. IV The purchasers of the checks here involved did not enter into a contract with DeLuxe Check Printers, Inc. for the purchase of such checks. V The selling by plaintiff to its customers of the checks here involved was intended to maximize the profits of the plaintiff by retaining and expanding the patronage of its depositors. VI Plaintiff was a retailer of the checks here involved. VII Plaintiff maintained a place of business in this State."

From these findings it concluded that the State correctly determined that the Bank was required to collect use tax from its customers with respect to the checks here involved pursuant to the provisions of section 6203 of the Revenue and Taxation Code; that the amount of use tax which the Bank was required to so collect constituted a debt owed by the Bank to the State;

that the State's determination was correct, valid and in accord with the provisions of the Revenue and Taxation Code and not in violation of any provisions of the federal Constitution or state Constitution.

### The Bank's Contentions

(1) That it was not a "retailer" who was required or authorized to collect use taxes from the depositors who purchased checks.

(2) That, if it is determined that the Bank was a retailer who was required to collect use taxes from the purchasers of the checks, the amount involved was illegally collected from the Bank because the law does not impose liability upon a retailer for use taxes which have not been collected from the purchasers.

(3) That if the law imposes a liability upon a retailer for an amount equal to use taxes which it should have collected but did not collect from the purchasers, that liability is a tax upon the retailer.

(4) That if the law imposes a tax upon retailers who have failed to collect use taxes from purchasers, it is a tax of a type which a state has no power to impose upon a national bank.

### The State's Contentions

(1) That the Bank was a retailer of these checks and as such was required to collect a use tax from the depositors with respect to the sale of the checks.

(2) That under the provisions of section 6204 of the Revenue and Taxation Code the Bank became indebted to the State for the amount equal to the use tax it was required to collect regardless of whether it did, in fact, collect such sum.

(3) That a national bank can be required to collect a use tax on behalf of the State from its customers.

### The Pertinent Statutory Law

The Revenue and Taxation Code sections pertinent to the issues presented by the instant case are set forth in the footnote.[1] All code sections hereafter cited are to the Revenue and Taxation Code unless otherwise indicated.

---

[1]Section 6201. "An excise tax is hereby imposed on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer . . . for storage, use, or other consumption in this State at the rate of 3 percent of the sales price of the property. . . ."

Section 6202. "Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. . . ."

## The Use Tax Law

One of the chief purposes of the use tax is to help retailers in this state, who are subject to sales tax, to compete on an equal footing with their out of state competitors who are exempt from the sales tax. Thus it is intended to reach property purchased for use and storage in this state from retailers who, being outside of the territorial boundaries of California, are not subject to its laws at all. It also seeks to reach such property where the taxable event of a sales tax, i.e., the sale, occurs outside of this state or where such property is immune from the sales tax because of the commerce clause. (*Southern Pac. Co.* v. *Gallagher,* 306 U.S. 167 [59 S. Ct. 389, 83 L. Ed. 586] ; *Douglas Aircraft Co., Inc.* v. *Johnson,* 13 Cal.2d 545 [90 P.2d 572] ; *Chicago Bridge & Iron Co.* v. *John-*

---

Section 6203. ''Every retailer maintaining a place of business in this State and making sales of tangible personal property for storage, use, or other consumption in this State . . . shall, at the time of making the sales or, if the storage, use, or other consumption of the tangible personal property is not then taxable hereunder, at the time the storage, use, or other consumption becomes taxable, collect the tax from the purchaser and give to the purchaser a receipt therefor in the manner and form prescribed by the board.''

Section 6204. ''The tax required to be collected by the retailer constitutes a debt owed by the retailer to this State.''

Section 6015. '' 'Retailer' includes: (a) Every seller who makes any retail sale or sales of tangible personal property. . . . (b) Every person engaged in the business of making sales for storage, use, or other consumption. . . .''

Section 6014. '' 'Seller' includes every person engaged in the business of selling tangible personal property of a kind the gross receipts from the retail sale of which are required to be included in the measure of the sales tax.''

Section 6006. '' 'Sale' means and includes: (a) Any transfer of title . . ., in any manner or any means whatsoever, of tangible personal property for a consideration. . . . (g) A transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated, or printed to the special order of the customer. . . .'' (Changed to subd. (f) in 1953.)

Section 6007. ''A 'retail sale' or 'sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property. The delivery in this State of tangible personal property by an owner . . . or by a factor, if the delivery is to a consumer pursuant to a retail sale made by a retailer not engaged in business in this State, is a retail sale in this State by the person making the delivery. He shall include the retail selling price of the property in his gross receipts.''

Section 6009. '' 'Use' includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business.''

Section 6401. ''The storage, use, or other consumption in this State of property, the gross receipts from the sale of which are required to be included in the measure of the sales tax, is exempted from the use tax.''

*son,* 19 Cal.2d 162 [119 P.2d 945] ; *People* v. *West Publishing Co.,* 35 Cal.2d 80 [216 P.2d 441] ; *Atchison etc. Ry. Co.* v. *State Board of Equalization,* 139 Cal.App.2d 411 [294 P.2d 181] ; *Brandtjen & Kluge* v. *Fincher,* 44 Cal.App.2d Supp. 939, 942 [111 P.2d 979] ; 3 Witkin, Summary of Calif. Law, § 137, p. 2250.) ■ The use tax is complemental to the sales tax, and as such is intended to supplement the latter by imposing upon those subject to it a tax burden equivalent to the sales tax in order that tangible personal property sold or utilized in this state would be taxable once for the support of the state government. (*Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. 167; *Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d 162; Traynor, *The Calif. Use Tax* (1936) 24 Cal. L. Rev., 175, 176-177.) ■ The tax is limited to the " '*use* . . . of property *purchased for use*' " within the state. (*Traynor, supra,* p. 176; *Atchison etc. Ry. Co.* v. *State Board of Equalization, supra,* 139 Cal.App.2d 411, 422.) It is not intended to apply to property subject to the sales tax. (*Traynor, supra,* p. 176.) This does not mean, however, that all property which is subject to the sales tax is exempt from the use tax, "but, rather, that all property *not actually covered* by the sales tax is subject to the use tax." (*In re Los Angeles Lumber Products Co.,* 45 F.Supp. 77, 86.) ■ As said in *Flying Tiger Line* v. *State Board of Equalization,* 157 Cal.App.2d 85 [320 P.2d 552] : "The use tax applies to property purchased for use in this state *wherever* purchased, unless the gross receipts from the sale have been included in the measure of the California sales tax (Rev. & Tax. Code, § 6401), or unless the transaction is otherwise exempted by the statute or by the state or federal Constitution." (P. 98; emphasis added.) ■ The use tax is imposed upon the purchaser rather than seller and the former is primarily liable therefor. (*Brandtjen & Kluge* v. *Fincher, supra,* 44 Cal.App.2d Supp. 939, 942; *Beneficial Standard Life Ins. Co.* v. *State Board of Equalization,* 199 Cal.App.2d 18, 20 [18 Cal.Rptr. 432].) ■ But it is the duty of the *retailer engaged in business* in this state to collect the use tax as the agent of the state for collection from the purchaser at the time of sale, if the storage, use or consumption is then taxable, otherwise at the time it becomes taxable, i.e., upon the retention by the purchaser and exercise of the right of ownership by him. (*Brandtjen & Kluge* v. *Fincher, supra; Beneficial Standard Life Ins. Co.* v. *State Board of Equalization, supra; Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. 167.) ■ The use tax which is

required to be collected by the retailer becomes the debt of the retailer to the state, and where the collection is not made, the retailer as such collection agent is liable for the default in the performance of his duty as such. (*Brandtjen & Kluge* v. *Fincher, supra,* pp. 942-943; *Beneficial Standard Life Ins. Co.* v. *State Board of Equalization, supra,* p. 20.) A retailer who pays the use tax without having collected it from the purchaser may recover it from the latter who is primarily liable even though he pays not under duress of person or property or by compulsion of legal proceedings, but solely to relieve himself from legal liability for the tax. (*Brandtjen & Kluge* v. *Fincher, supra,* 44 Cal.App.2d Supp. 939, 943.)

It should be pointed out, moreover, that while the California sales tax and use tax are complemental to each other, they are not interdependent. Each is a separate tax. The sales tax is imposed upon the retailer for the privilege of selling tangible personal property (§ 6051), while the use tax, as we have pointed out above, is upon the purchaser who stores, uses or consumes property in this state. A perusal of the legislative history of the two acts discloses that at the time the use act was enacted (in 1935), local sales had already been subjected to sales tax (since 1933). It is conceivable that the sales tax might be abolished completely, thus requiring only the buyers to pay a use tax for the use, storage, or other consumption of the article purchased irrespective of its origin. (See *In re Los Angeles Lumber Products Co., supra,* 45 F. Supp. 77, 86.) The definitions contained in the "Sales and Use Tax Law" (§§ 6002 to 6019 incl.), however, apply to both taxes, except where the context specifically limits the particular definition to one and not the other. (§ 6002.)

### Effect of the Trial Court's Findings

Since the questions on this appeal involve the applicability of certain statutes to a given situation presented on stipulated and uncontradicted facts, they are questions of law, the determination of which devolves upon us in accordance with the applicable principles of law. Accordingly, we are not necessarily bound by the findings below in the determination of these questions. (*Peterson Tractor Co.* v. *State Board of Equalization,* 199 Cal.App.2d 662 [18 Cal.Rptr. 800]; *Pacific Pipeline Constr. Co.* v. *State Board of Equalization,* 49 Cal. 2d 729, 736 [321 P.2d 729]; *Estate of Madison,* 26 Cal.2d 453, 456 [159 P.2d 630]; *Meyer* v. *State Board of Equalization,* 42 Cal.2d 376, 381 [267 P.2d 251]; *Dunning* v. *Dunning,* 114 Cal.App.2d 110, 114-115 [249 P.2d 609].)

## Was the Bank a Retailer?

The crucial question in this case is whether the Bank was a "retailer" as that term is defined in its application to the use tax law under section 6203. It is undisputed that the checks were delivered or transmitted for the use of the Bank's customers in this state, thus making them primarily liable for use tax. The inquiry narrows down to whether the Bank was a "retailer maintaining a place of business in this State and making sales" of checks for the use of its customers. (See § 6203.)

The "retailer" with which we are here concerned is such as is defined in section 6015, subdivision (b), i.e., a "person engaged in the business of making sales. . . ." The "retailer" subject to our inquiry does not have to be a "seller," nor is he one who makes a "retail sale" or a "sale at retail" because these definitions apply only to a retailer who is subject to a tax upon his "gross receipts" and hence only to the sales tax. (See §§ 6007, 6012, 6014, and 6051.)

We turn first to the determination of whether the Bank made "sales" of these checks to its customers. A "sale" is defined in section 6006, subdivision (a), to mean and include "Any transfer of title . . . of tangible personal property for a consideration." This definition "coincides with the common-law definition of a 'sale' and is substantially the same as that used in the Uniform Sales Act." (*Select Base Materials* v. *Board of Equalization,* 51 Cal.2d 640, 645 [335 P.2d 672]; Civ. Code, § 1721.) Particularly applicable here is subdivision (f) (formerly subd. (g)) of said section which includes in the definition of " 'Sale' " "A transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated, or *printed to the special order of the customer.* . . ." (Emphasis added.)

 There can be no doubt upon the record here that a valid, enforceable contract was entered into between the Bank and its depositor in each order for said checks. That contract was simply one for the sale and delivery to the customer of personalized checks in California for a fixed and agreed price. The brochure and the order form on its reverse side make no reference to DeLuxe. The depositor had no dealings with De-Luxe; all of his dealings were with the Bank. Indeed, if he had any complaints with reference to the checks he directed them to the Bank. The face of the brochure, describing the checks and cover, constitutes at least an offer by the Bank to enter into negotiations for the sale of personalized checks for

the price there indicated. It states: "Mailed direct to you . . . No need to call for them at the bank. 200 for $1.45 plus 10¢ mailing charge. Complete the order form on reverse side—mail to bank." The order form which states "Mail or deliver this order to your branch" is directed to the Bank and constitutes an offer by the depositor to buy the checks. It reads: "Please enter my order for___personalized checks and charge cost to my account." It contains a blank for the amount to be debited and contains mailing and imprinting instructions. At the bottom there is the following language: "Order accepted by _____Branch Bank of America N.T. & S.A." Clearly, the acceptance of this order by the Bank would constitute an acceptance of the depositor's order, and hence the consummation of a contract of sale. Such a contract most certainly implies a transfer of title to checks. The least that can be said is that it transfers possession of checks printed at the special order of the depositor as stated in section 6006, subdivision (f). It should be further pointed out that the record is devoid of any evidence that the depositor knew that the checks were to be printed by DeLuxe, or of the arrangements between DeLuxe and the Bank, or that the Bank was to receive a five cents' handling charge out of the full price paid by him. It would be but to cavil to assert that the Bank did not receive any consideration. In our opinion it was the full amount paid for the checks in each order; at its very least, it was the five cents' "handling charge." As we shall discuss later, the fact that the Bank did not make a profit is immaterial. Suffice it to say, the stipulated and uncontradicted facts warrant the conclusion, in legal effect, that there was a sale from DeLuxe to the Bank and a resale from the Bank to its depositor. (See *Graybar Electric Co.* v. *Curry,* 238 Ala. 116 [189 So. 186], cited with approval by *Meyer* v. *State Board of Equalization, supra,* 42 Cal.2d 376, 382.)

The Bank is content, in its briefs, to call itself an "intermediary." Webster defines an intermediary as "an interagent; a go-between; . . . That which serves as a medium or means. . . ." (Webster's New Int. Dict. (2d ed, 1939).) In the narrative above the Bank may well have been an intermediary in the chain of the sale of the checks, but it was none the less a person who sold the checks to its depositors. The Bank has adroitly steered away from any assertion that it was an agent for DeLuxe either in its complaint, at the trial or on this appeal. It clearly appears to us that if the Bank was not an independent contractor in its relationship with

DeLuxe, it could only be, under the facts here, an agent for DeLuxe, an undisclosed principal. Although the case was not tried on the theory of agency for an undisclosed principal, such a determination would not alter the conclusion reached by us. ▮▮▮ A contract made by an agent for an undisclosed principal is for most purposes the contract of the principal, yet it may also be considered as the contract of the agent. Thus the agent may be sued thereon individually and he himself may sue and recover on the contract as an individual. (*Johnson* v. *Benton*, 73 Cal.App. 571, 574 [239 P. 63]; *London* v. *Zachary*, 92 Cal.App.2d 654, 657 [207 P.2d 1067]; *Knoch* v. *Haizlip*, 163 Cal. 146, 151 [124 P. 998]; *Patterson* v. *John P. Mills etc., Inc.*, 203 Cal. 419, 421 [264 P. 759]; *Geary St., etc. R. R. Co.* v. *Rolph*, 189 Cal. 59, 64 [207 P. 539]; *J. M. Wildman, Inc.* v. *Stults*, 176 Cal.App.2d 670, 674 [1 Cal.Rptr. 651]; *Allen* v. *Dailey*, 92 Cal.App. 308, 315 [268 P. 404]; Civ. Code, § 2343.) ▮▮▮ The Bank, having placed itself in a position to enjoy the advantages of the sale must also bear the obligations of the contract of sale including the statutory duties inherent therein. To hold otherwise would permit an easy escape from the obligations imposed by the use tax law through the simple expedient of designating oneself as a mere "intermediary."

▮▮▮ We must next determine whether the Bank was "engaged in the business" of making sales of said checks as that term is used in section 6015, subdivision (b). As defined in section 6013 " 'Business' includes any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit, or advantage, either direct or indirect." The Bank urges that it was not in the business of selling checks but was merely rendering banking services. ▮▮▮ The term "business" must be interpreted, however, in the light of the foregoing statutory definition. (*Market St. Ry. Co.* v. *California State Board of Equalization*, 137 Cal.App.2d 87, 95 [290 P.2d 20].) Accordingly, it is not used in the commercial sense nor is it necessarily restricted to a commercial enterprise. It is not necessary, moreover, that the main business of the one who sells be that of making of retail sales, or for that matter, that the sales in question occur in the regular business of the seller. (*Bigsby* v. *Johnson*, 18 Cal.2d 860 [118 P.2d 289]; *Market St. Ry. Co.* v. *California State Board of Equalization*, supra.) The sole test is whether there have been a sufficient number of sales of tangible personal property to a buyer for his use in this state, and not for resale in the

regular course of the buyer's business. (See *Market St. Ry. Co.* v. *California State Board of Equalization, supra.*) ▇▇▇ It appears that the purchaser is liable under the use tax law if he makes but one purchase of property subject to the use tax law (§ 6202), whereas before a seller becomes subject to sales tax at least two retail sales are necessary. (See § 6019.) ▇▇▇ When applied to the liability of a retailer for the collection of the use tax under section 6203 reference is made to "sales," the requirement being that the retailer engage in more than one isolated sale. The number, scope and character of the "sales" must be considered. (*Market St. Ry. Co.* v. *California State Board of Equalization, supra; Northwestern Pac. R.R.* v. *State Board of Equalization,* 21 Cal.2d 524 [133 P.2d 400].) In *Los Angeles etc. School Dist.* v. *State Board of Equalization,* 71 Cal.App.2d 486 [163 P.2d 45], decided prior to the enactment of section 6019, it was held that a school board was engaged in "business" as a "retailer" because it made two or three sales of used equipment quarterly. In the instant case the Bank made sales which aggregated $1,229,949.70. A mathematical division into this sum of the amounts charged for each check order readily demonstrates that the individual sales ran into many thousands.

▇▇▇ The fact that the Bank's activities with respect to these checks were carried on at a loss is not relevant to the determination of the question because it is not required that the sales be made with the intention of making a profit. As said in *Market St. Ry. Co.,* "The criterion expressed in the statute is 'gain, benefit, or advantage,' not 'profit.' " (P. 95.) (Citing *Union League Club* v. *Johnson,* 18 Cal.2d 275 [115 P.2d 425], where sales by a nonprofit corporation were held to be taxable notwithstanding its activities were carried on at a loss.) There can be no question here that the sale of the checks had for their objective a benefit and advantage to the Bank in connection with its banking services and the betterment of its relations with its customers.

▇▇▇ The facts of this case impel the conclusion that the Bank sold checks for the use of its customers in sufficient quantities to make it a person engaged in the business of selling such checks. That it "maintained a place" in this state where such "business" was engaged in so as to satisfy the requirements of section 6203, is, of course, beyond dispute. Accordingly, we conclude that under the applicable statutes the Bank was a "retailer" as therein contemplated.

### Is a Retailer Who Has Failed to Collect Use Taxes Liable to the State for Such Taxes?

 This question appears to be clearly answered by section 6203 which states that the retailer *shall collect* the tax and by section 6204 which provides that "The tax *required to be collected* by the retailer constitutes a debt owed by the retailer to this State." (Emphasis added.) In the face of this language, the Bank contends that a retailer is not obliged to collect the tax, and that he becomes indebted to the State only if he has actually collected the tax from the purchaser. This contention is effectively answered by *Beneficial Standard Life* and *Brandtjen & Kluge*. In *Beneficial Standard Life* the retailer who had failed to collect the use tax from its vendees was held liable to the state for its collection and payment.

The Bank urges further that section 6204 is unconstitutional in that it amounts to an arbitrary creation of a debt (where no tax is actually collected) and a taking of property without due process of law in violation of the Fourteenth Amendment to the federal Constitution. It is also asserted by the appellant that such liability cannot be imposed unless it is first determined that it is the purpose and intention of this section to impose a tax or a penalty. These contentions, says the respondent, are now being urged for the first time on appeal and should be precluded under the familiar and well-established rule of appellate review that questions not raised in the trial court will not be considered on appeal. A perusal of the clerk's and reporter's transcripts bears out the respondent's claim. It also appears that they were not asserted in the claim for refund. This is likewise fatal, urges the respondent, because any grounds for a recovery must be included in the claim for refund in order to be raised in court. (Citing *Richfield Oil Corp.* v. *State Board of Equalization,* 329 U.S. 69 [67 S.Ct. 156, 91 L.Ed. 80], a case involving the California Sales and Use Tax Law.) This failure, says the respondent, further inhibits the appellant from raising an additional ground under the rule that the latter has thus failed to exhaust its administrative remedies. (Citing *Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 291, 296 [109 P.2d 942, 132 A.L.R. 715]; *West Publishing Co.* v. *McColgan,* 27 Cal.2d 705, 712 [166 P.2d 861]; *People* v. *Keith Railway Equipment Co.,* 70 Cal.App.2d 339, 346-347 [16 P.2d 244].) The authorities cited by the respondent support its contentions. Suffice it to say, however, the constitutionality of the California Use Tax Act in its entirety has long been established.

(*Douglas Aircraft Co., Inc.* v. *Johnson, supra,* 13 Cal.2d 545; *Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. 167; *Felt & Tarrant Co.* v. *Gallagher,* 306 U.S. 62 [59 S.Ct. 376, 83 L.Ed. 488].) The *Felt & Tarrant Co.* case, in particular, answers the appellant's contentions. The cases which establish the right in the State to compel the retailer to collect the tax and to make him its debtor therefor, whether he collects the tax or not, find their basis in the lawfulness of the familiar and sanctioned device which makes the retailer the tax collector for the State, and not upon considerations of the imposition of a penalty or tax upon the retailer. (See *Brandtjen & Kluge* v. *Fincher, supra,* 44 Cal.App.2d Supp. 939; *Felt & Tarrant Co.* v. *Gallagher, supra,* 306 U.S. 62; *General Trading Co.* v. *State Tax Com. of Iowa,* 322 U.S. 335 [64 S.Ct. 1028, 88 L.Ed. 1309]; *Monamotor Oil Co.* v. *Johnson,* 292 U.S. 86 [54 S.Ct. 575, 78 L.Ed. 1141].)

*Is the Liability Imposed by Section 6204*
*a Tax Upon the Retailer?*

 As we have hereinabove discussed the use tax is a tax levied upon the purchaser. It is not a tax on the retailer; nor does it shift to him because he has the duty to collect it from the consumer. The retailer is merely the agent *through* which the collection is made. As said in *Monamotor Oil Co.,* "Instead of collecting the tax from the user through its own officers, the state makes the distributor its agent for that purpose." (P. 93.) The provision making the tax a debt of the retailer to the State, where he is required to collect it, is part of a valid statutory scheme making the retailer an agent of the State for collection, and its effect, where such collection is not made, is merely to hold the collection agent liable *for his default* in the performance of his duty as such. (*Brandtjen & Kluge* v. *Fincher, supra,* 44 Cal.App.2d Supp. 939, 942-943.) As said in *Brandtjen & Kluge,* "the *unpaid tax* may yet be collected by the state from the purchaser under sections . . . which provide proceedings looking to such collection." (P. 943; emphasis added.)
 The liability of the retailer is not, therefore, for the use tax itself but for an *amount equivalent* to it because of his default in his duty as collection agent. The taxpayer is the person ultimately liable for the tax itself, and not the person who pays the tax liability. (See *Colorado Nat. Bank* v. *Bedford,* 310 U.S. 41 [60 S.Ct. 800, 84 L.Ed. 1067].) And, as pointed out in *Brandtjen & Kluge,* the retailer is

merely paying the debt of another when he pays the purchaser's tax, and as such stands in a position analogous to that of a surety for the purchaser so as to entitle him to reimbursement. ▆▆▆ Accordingly, the liability of the retailer under section 6204, by virtue of its wording and as construed by the cases, is for a debt rather than for taxes.

The appellant has cited cases which it claims support its contention that the liability herein imposed is in fact and in substance a tax. An analysis of these cases discloses that in each instance the liability was held to be a tax rather than a debt because of the particular wording of the statute involved, or was so construed by the highest court of the state passing upon its interpretation. Four of the cases deal with the New York City *sales* tax. (*Matter of Grant Co.* v. *Joseph,* 2 N.Y.2d 196 [159 N.Y.S.2d 150, 140 N.E.2d 244]; *Matter of Atlas Television Co.,* 273 N.Y. 51 [6 N.E.2d 94]; *Matter of Fifth Ave. Bldg. Co.* v. *Joseph,* 297 N.Y. 278 [79 N.E.2d 22]; *New York* v. *Feiring,* 313 U.S. 283 [61 S.Ct. 1028, 85 L.Ed. 1333].) The *Grant Co.* case, decided in 1957, cites the other three as authority for its holding that the New York City sales tax makes the vendor and vendee alternate taxpayers; that under this legislation which provides that the " '*vendor shall be liable for the collection thereof and for the tax,*' " the vendor is deemed a taxpayer; that the obligation imposed on him is that of a taxpayer in addition to that of a collecting trustee; and that the obligation is in the nature of a tax which is " 'not measured by the amount collected nor dependent upon failure to exercise the diligence in collection which would be required of an agent.' " (P. 203.) *Feiring* makes the same interpretation, in essence, and holds that the said sales tax is a tax on the seller and as such is entitled to priority under section 64 of the Bankruptcy Act when the seller becomes bankrupt.

Two other cases are cited by appellant: *United States* v. *New York,* 315 U.S. 510 [62 S.Ct. 712, 86 L.Ed. 998], and *Scripto* v. *Carson,* 362 U.S. 207 [80 S.Ct. 619, 4 L.Ed.2d 660]. The former was called upon to construe the Social Security Act in connection with the determination of priority under section 64 of the Bankruptcy Act. The court there relied on *Feiring* in concluding that the amounts directed by the act to be deducted from the wages of employees constituted a tax due from the employer. The court was there construing a statute which provided that " 'Every employer required so to deduct the tax *is hereby made liable for the payment of*

*such tax,' "* (§ 802, p. 512, fn. 2) and a Treasury Department ruling that *the tax* may be assessed against the employer, regardless of whether he has in fact deducted it from the employee's wages. The *Scripto* case is the only one which involves the use tax. The United States Supreme Court was there confronted only with the question of the constitutionality of the Florida use tax which made such tax " 'collectible from all dealers.' " (Pp. 207-208, fn. 1.) In upholding the act the court relied on *General Trading Co.* and the construction placed on the act by the Florida Supreme Court to the effect that under Florida law the use tax is a tax for which the dealer is liable. The Florida statute is readily distinguishable from the California statute. The former specifically imposes the use tax on the dealer (or retailer), while the latter imposes it upon the purchaser or consumer. (§ 6203.)

The Bank makes an additional argument to the effect that the instant liability was assessed and collected as a tax. It asserts that the " 'Report of Field Audit,' " and " 'Notice of Determination Under the Sales and Use Tax Law' " and " 'Notice of Redetermination under the Sales and Use Tax Law' " designate the liability as a tax. We, of course, are not bound by what the parties may have called the liability, because whether it is in fact a tax under the facts here is a question of law. Needless to say, the statutory debt under section 6204 arises under the Sales and Use Tax Law. It is apparent from these documents that they have reference to the measure upon which the tax is computed and the statutory liability therefor. The Board's letter of transmittal to the Bank accompanying the "Report of Field Audit" refers to "your liability under the Sales and Use Tax Law." Under the designation "Analysis of Measure of Tax By Class of Transaction" in said report it is stated: "Sales of personalized checks subject to Use-Tax not reported." While it is not before us as an exhibit, it appears from the reporter's transcript that when counsel were discussing the issues with the trial court in their opening statements, counsel for appellant acknowledged that the Bank in its petition for redetermination had made the statement that it was involved in this matter not as a taxpayer but because the State had determined that it was an agent for collection and therefore liable for its failure to collect the tax. It appears, accordingly, that the Bank was aware of the basis of its liability at the time it paid the amount in controversy, and that the question of the

Bank's relationship to the State in these transactions was before the trial court for its consideration.

### May a National Bank Be Made an Agent of the State for the Collection of the Use Tax?

■■■ A state may tax a national bank only as permitted by Congress. (*Security-First Nat. Bank* v. *Franchise Tax Board*, 55 Cal.2d 407 [11 Cal.Rptr. 289, 359 P.2d 625]; *Bank of California* v. *Richardson*, 248 U.S. 476 [39 S.Ct. 165, 63 L.Ed. 372].) The limits of permissible taxation of national banks is set forth in section 5219 of the Revised Statutes of the United States. (12 U.S.C.A., § 548.) ■■■ The only taxes which the State of California can impose upon national banks, within such limitation and the method authorized by Congress, are those specified in section 16 of Article XIII of the California Constitution, as follows: taxes according to or measured by their net income, taxes on real property, and motor vehicle taxes and registration fees permitted by Congress.

If the instant obligation is in fact a tax, as contended by appellant, it would be in violation of federal law, but as we have pointed out above the obligation is not a tax but a debt. Is such a debt within the proscription? ■■■ It has been held that although an institution is exempt from taxation it may be required to collect a tax due from its customers. (*Colorado Nat. Bank* v. *Bedford, supra,* 310 U.S. 41; *Beneficial Standard Life Ins. Co.* v. *State Board of Equalization, supra,* 199 Cal.App.2d 18.)

In *Beneficial Standard Life Ins. Co.* the court held that the State could properly impose liability upon an insurance company for use tax upon retail sales of tangible personal property made by it, even though the insurer is exempt from taxation under the California Constitution because the use tax is upon the purchaser and not upon the insurance company retailer.

In *Colorado Nat. Bank,* the United States Supreme Court held that a Colorado state statute requiring a national bank to collect from its customers a 2 per cent tax measured by the bank's charges for safe deposit boxes, to account for them to the state, and to include them in their bill for services, and providing further for a credit on future taxes paid on accounts eventually found worthless did not impose an unconstitutional burden upon a federal instrumentality. The rationale of the case is analogous to and consistent with the rule (discussed above) which imposes upon the retailer the duty of collecting

a use tax as the state's agent for collection. The court said: "Congress has not legislated against taxation of the customers of national banks. . . . By § 6 of the Colorado act the 'person rendering or performing services shall be liable' for the payment of the tax imposed. But as subsection (b) of that same section requires the tax paid to be added to the charges for service 'as a separate and distinct item' and makes it a debt from the user of the services until paid, the tax is upon the user of the safe-deposit boxes, not upon the bank. Furthermore, as by § 2(h) credit is given to the bank for taxes paid on accounts subsequently found worthless and the bank is in a position to require payment of box rentals and taxes in advance, there is no occasion for a bank ever to have saddled upon it any part of the tax burden." (P. 51.)

In *Brandtjen & Kluge* the court likewise indicated that the use tax paid by the retailer for and on behalf of the purchaser becomes a debt of the latter to the former. In the instant case, too, there was no occasion for the Bank to have been saddled with any tax burden because it had the right to charge and collect the tax at the time the checks were delivered to its customers. The facts disclose that at the time the checks were delivered to the customer the Bank collected the price for them in cash or charged the depositor's account. It would have been a simple expedient to add thereto the amount of the use tax.

The Bank seeks to distinguish the instant case from *Colorado Nat. Bank* on the ground that in the latter case the bank was to be compensated for its services, while here the Bank is obligated to pay from its own funds. This, of course, results from the Bank's decision (as testified to by Tobey) that it was not obligated to collect the tax and hence did not do so. It should be noted, however, that while the Bank asserts that the check transaction operated at loss, the Bank was compensated for its services to the extent of the five cents' "handling charge," the amount of which was more than the 3 per cent use tax which became due on each check order. The issue is not whether the Bank is compelled to pay from its own funds, but whether such liability impairs the efficiency of a national bank in the performance of its functions as an instrumentality of the federal government. ▮▮▮ It is only when the state law incapacitates the banks from discharging their duties to the federal government that it becomes unconstitutional. (*First National Bank* v. *Commonwealth of Kentucky*, 76 U.S. (9 Wall.) 353 [19 L.Ed. 701].) In *First National*

*Bank* the court points out that national banks are more subject to the laws of the states in the daily course of business than those of the federal government. Thus they may be sued for debts under state law or they may be attached or garnisheed. The liability imposed by section 6204 is no more of an interference with the Bank's functions than any other legal proceeding to which its business operations may subject it. Indeed, we fail to see how such a liability hinders the Bank from the performance of its duties as a financial agent for the federal government.

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 16, 1963.