[Civ. No. 33642. Second Dist., Div. One. July 17, 1969.]

EDMOND STEPHAN, Plaintiff and Respondent, v. GEORGE MALOOF et al., Defendants and Appellants.

Eliot B. Feldman for Defendants and Appellants.

Theodore S. Tabah for Plaintiff and Respondent.

.. LILLIE, J.—Judgment was entered for plaintiff, a licensed general contractor, and against defendants in the sum of $12,597 for loss of profits arising from breach of an oral agreement to construct a one-story shopping center on certain Los Angeles property belonging to defendants as co-owners (tenants in common). Three points are made on defendants' appeal from the judgment—first, contrary to the parties' intentions, the agreement was never reduced to writing and hence no binding agreement resulted; second, the trial court erroneously found that defendant George Maloof while dealing with plaintiff had authority to bind his co-owners; and finally, the trial court erred in the amount of damages awarded.

Necessarily viewed in a light most favorable to plaintiff-respondent, the evidence reveals among other things that plaintiff was first approached by defendant George Maloof (referred to hereinafter as "George") and his mother, defendant Annie Maloof, in November of 1965; at that time plaintiff was in the midst of a construction job at a site some eight blocks from defendants' property. During the conversation which followed, they sought plaintiff's advice regarding the demolition of certain structures on their land where they proposed to erect a one-story shopping center. A few days

later, in response to an inquiry by George, plaintiff indicated he was interested in bidding on the proposed shopping center. Thereafter George delivered to plaintiff two sets of plans and specifications, together with an "Invitation to Bid" which contained a "Bid Form." The "Invitation to Bid," prepared by defendants' architect at their direction, included the following: "Selected bidder shall execute a contract for construction of the work within five days of notice of selection." The "Bid Form," in turn, provided in pertinent part that "The undersigned further agrees, if awarded the contract, to sign the contract and to furnish a performance bond. . . ."

On January 14, 1966, plaintiff delivered his bid to George upon the form he had been furnished. Thereafter, at meetings held on various dates in January and February, plaintiff and George discussed certain proposed changes in the plans and specifications; revised bids were prepared and delivered by plaintiff as a result of such meetings. Subsequently, on February 21, George delivered to plaintiff his latest revised plans which included a doughnut shop addition to the center; after reviewing them, on February 25 plaintiff submitted his latest revised bid. On February 27 plaintiff and George met at the latter's home and agreed that there would be no further changes in the revised plans which were complete and specific as to type and grade of materials. The parties also agreed on the method of compensating plaintiff, the commencement of construction by March 4, 1966, a construction period of 120 days, and the necessity of securing a construction bond.

The following morning (February 28) plaintiff received a telephone call from George; during the course of their conversation plaintiff stated that he could do the job for $79,453. To this statement, according to plaintiff, George replied: "If you can do the job for $79,000, you have it." Plaintiff's rejoinder was: "I accept your offer and I thank you very much for the job." George then told plaintiff to go ahead: "Let's get on the ball. Let's get this thing rolling." Plaintiff replied: "Fine, I will get right on the phone now and start." Immediately thereafter plaintiff telephoned his concrete man, telling him to come on the job the following day (March 1); a chemical toilet was also ordered, and calls made by plaintiff to the plumber, electrician, steel man and other subcontractors.

Later that same day (February 28) George telephoned plaintiff to "hold off" until he (George) "ha[d] a completion bond in hand." Plaintiff then went to a bonding com-

pany, obtained the issued completion bond and delivered it to George that evening.[1] At an earlier meeting that same day, it appears that plaintiff also delivered to George a letter stating in part that "I am pleased to be awarded this work and hope to produce a structure we can both be proud to be associated with."

Still later on February 28, plaintiff was again at George's house. Present for the first time were the remaining defendants. Various questions were asked of plaintiff with reference to plans and specifications. A completed and standard A.I.A. contract was presented to plaintiff which contained all the terms and conditions reached at previous meetings. Plaintiff signed, requesting defendants to do the same; they declined to do so. On March 3 plaintiff telephoned George, directing attention to the necessity of commencing construction by March 4; George told plaintiff not to worry as he (George) had obtained an extension of time, adding: "Do nothing until you hear from me." Shortly thereafter, while passing the site in question, plaintiff noticed a building under construction; he testified that the same plans and specifications were being followed. The court made a finding (unchallenged by defendants) that the center was eventually completed for the total sum of $77,000, materials of a lesser cost being substituted.

In support of their first contention, defendants cite the decision of this court in *Apablasa* v. *Merritt & Co.*, 176 Cal.App.2d 719 [1 Cal.Rptr. 500], adhering to the settled rule that "if the parties intend a reduction of their proposed agreement to writing before it can be considered complete, there is no contract until the formal agreement is signed [citations]." (P. 729.) The difference between that case and the case at hand is that there the preliminary negotiations relating to the production of plaintiff's invention, and assertedly resulting in a binding agreement, never reached the point where there was a meeting of the minds on all material matters: " 'There is no meeting of the minds of the parties while they are merely negotiating as to the terms of the agreement to be entered into. To be final, the agreement must extend to all terms which the parties intend to intro-

[1]The superintendent of the bonding company testified that on the morning of February 28 he received a phone call from a man identifying himself as George; that George stated he would issue the contract and was being held up by the bond. This witness, when asked on cross-examination whether it was normal procedure to issue a bond for the sum in question ($79,000) "on a purported oral contract," replied: "Yes, it is."

duce, and material terms cannot be left for future settlement. . . . [citation].' '' (P. 730.) ▮▮▮ Here, however, it is not contended that all of the material conditions and terms were not agreed upon. Thus, defendants' brief is singularly silent with respect to any claim that further negotiations were necessary to effect a mutual understanding of the parties. Instead, it is simply argued that since plaintiff tried to secure the signature of all defendants on the contract tendered to him at the February 28 meeting in George's home, his act in so doing indicated unanimity among the parties that no one would be bound until each such signature was obtained.

There is no merit to such argument, likewise rejected in *Clarke* v. *Fiedler,* 44 Cal.App.2d 838 [113 P.2d 275], upon facts closely analagous to those at bar. There, the parties finally (and orally) agreed upon the terms of the agreement after several previous meetings; the following day plaintiff presented a written contract for defendant's signature, but the latter refused to sign. Pertinent here is the court's declaration that ''the formal written contract [was] not the agreement of the parties, but only evidence of that agreement.'' (P. 846.) Accordingly, the decision is one of numerous others to the effect that when the parties orally agree upon all the terms and conditions of an agreement with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed does not alter the binding validity of the oral agreement. (See *Schwartz* v. *Shapiro,* 229 Cal.App. 2d 238, 247-248 [40 Cal.Rptr. 189].) The rule of such cases has been stated thus by Witkin : ''Parties may engage in preliminary negotiations, oral or written, in order to reach an agreement. These negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend that a formal writing embodying these terms shall be executed later.'' (1 Summary of Cal. Law (1960) p. 46.) ▮▮▮ Too, whether it was the intention of the parties that such oral agreement should become binding *eo instante* is to be determined by the trier of fact from the surrounding circumstances. (*Schwartz* v. *Shapiro, supra,* p. 248.) ▮▮▮ Finally, justice and fair dealing fully support the rationale of the above holdings as set forth in *Clarke* v. *Fiedler, supra,* quoting from a New York case : '' 'Any other rule would always permit a party who has entered into a contract like this, through letters and telegraphic messages, to violate it, whenever the understanding was that it should be

reduced to another written form, by simply suggesting other and additional terms and conditions. If this were the rule the contract would never be completed in cases where, by changes in the market, or other events occurring subsequent to the written negotiations, it became the interest of either party to adopt that course in order to escape or evade obligations incurred in the ordinary course of commercial business. . . . If the parties did not become bound in this case they cannot be bound in any case.' '' (44 Cal.App.2d 838, 847.) The above statement may be considered to have been prophetically made to fit the instant proceeding.

Likewise unsustainable is defendants' next contention that George lacked the necessary authority ''to bind the other co-owners,'' the remaining defendants being his mother and two sisters. In this latter regard, preliminarily, the trial court made the finding (not here challenged) that George's mother and sisters ''are inexperienced business individuals, are unfamiliar with plans and specifications, and relied upon the knowledge and experience of defendant, George Malouf [sic].''[2] Since this claim challenges the sufficiency of the evidence that he possessed such authority, we need only determine whether the record contains any substantial evidence to support the findings of the trial court. (*Tomerlin* v. *Canadian Indem. Co.,* 61 Cal.2d 638, 643 [39 Cal.Rptr. 731, 394 P.2d 571].) An agency is ''actual'' when the agent is really employed by the principal (Civ. Code, § 2299); it is ''ostensible'' when the principal intentionally or by want of ordinary care causes the third person to believe another is his agent who is not really employed by him. (Civ. Code, § 2300.) It is stated in *Tomerlin, supra*: ''To establish actual or ostensible authority the principal's consent need not be express. 'Agency may be implied from the facts of a particular case, and if a principal by his acts has led others to believe that he has conferred authority upon an agent, he cannot be heard to assert, as against third parties who have relied thereon in good faith, that he did not intend to confer such power. . . . An agent's authority may be proved by circumstantial evidence. . . .' [Citation.]'' (P. 644.)

Substantial evidence is contained in the record to support the finding of George's authority, actual or ostensible. The architect (Mr. Hashem) employed by defendants to prepare

---

[2]George testified that he was a licensed practicing pharmacist and the holder of a doctorate in pharmacy awarded in 1962 (three years prior to the events in suit).

plans and specifications testified that he was first contacted by Mrs. (Annie) Maloof; that thereafter such plans and specifications were discussed at meetings attended by some or all of the defendants. According to Hashem, ''Early in discussion we thought for simplifying the correct owners I will use George's name, and since then I start putting on the drawing board only George's name.'' Later: ''When earlier they told me for simplification to use 'George Maloof,' I kept using it. That's all I can say.'' Accordingly, the plans and specifications eventually delivered to plaintiff stated that they were ''For George Maloof . . . Owner,'' and the same was true of the ''Invitation to Bid.'' Defendant Nellie Maloof testified that she never made complaint that such ''Invitation'' read ''for George,'' while defendant Jeanette Ashamalla stated: ''We are a family. We know what goes on.'' Finally, plaintiff testified that defendant Annie Maloof on one occasion said to him: ''George is now the man in this house and he is going to do this.'' From the above, and other circumstances unnecessary to set forth, the inference was reasonably deducible that George's mother and sisters knew that by his conduct generally he was holding himself out as clothed with certain authority and yet remained silent; accordingly such silence on their part gives rise to liability. (*Marr* v. *Postal Union Life Ins. Co.*, 40 Cal.App.2d 673, 679 [105 P.2d 649].) ■ As for George himself, it is of course settled that while a contract made by an agent for an undisclosed principal is (as shown above) the contract of the principal, it also may be considered the contract of the agent upon which he may be sued individually. (*Bank of America* v. *State Board of Equalization*, 209 Cal.App.2d 780, 796 [26 Cal.Rptr. 348].)

■ There is no merit to defendants' final point that the award of damages was erroneous because of uncertainty as to plaintiff's cost of performance. ■ While it is provided by section 3301, Civil Code, that ''No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin'' such provisions have been liberally construed. Thus, it has been repeatedly held that where there is no uncertainty as to the fact of damage, that is, as to its nature, existence or cause, the same certainty as to its amount is not required. (*Tomlinson* v. *Wander Seed & Bulb Co.*, 177 Cal.App.2d 462, 474 [2 Cal.Rptr. 310].) ■ Too, one whose wrongful conduct has made difficult ascertainment of damages cannot complain because the court must make estimate of damages and not exact computation, provided that

estimate is reasonable. (*Macken* v. *Martinez*, 214 Cal.App.2d 784, 790 [29 Cal.Rptr. 867].) Plaintiff prepared and submitted his cost analysis breakdown which was received as an exhibit. Not all of the items of costs were supported by subcontractors' bids, and it is as to these missing items that defendants claim uncertainty. But plaintiff testified as an expert (with 13 years of experience as a builder), his qualifications in that regard being stipulated. Since his testimony fixed loss of profits in the sum of $12,597, the difference between the contract price and the cost of construction, it was for the trier of fact to determine whether plaintiff's valuation of the items unsupported by bids was fair and reasonable; furthermore, plaintiff's final figure was uncontradicted and appears to have been the best evidence available.

 It is also asserted that the trial court failed to deduct the value of plaintiff's own services on the theory that "this is a part of this cost of performance of which he was relieved by the breach." (3 Am.Jur., Proof of Facts, p. 613.) No California case is cited for such proposition which is raised for the first time by appellate counsel; if, as it seems, defendants are relying on the doctrine of mitigation of damages, it is inapplicable to the instant case which does not involve the breach of a contract for personal services. (*Gollaher* v. *Midwood Constr. Co.*, 194 Cal.App.2d 640, 651 [15 Cal.Rptr. 292].) It is further contended (for the first time), citing the above work (3 Am.Jur., Proof of Facts, p. 616) that no allowance was made for plaintiff's "release from care, trouble, risk, and responsibility which would have attended the full execution of the contract." Again, no California authority is cited. In view of the plethora of cases in this jurisdiction dispositive of the measure of damages in proceedings such as this, none of which support or suggest the soundness of the claim contended for, we are not persuaded that the item of asserted damage above mentioned should be given any consideration at bar.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.