797 F.2d 565
 ARKANSAS RICE GROWERS COOPERATIVE ASSOCIATION, a
corporation, d/b/a Riceland Foods, Appellees,
v.
ALCHEMY INDUSTRIES, INC.; Norman Pitt, Inc.; Sol Balkin;
Janelle Balkin; Seymour DiMatoff; Eleanor DiMatoff;
Robert Kahan; Dorothy E. Kahan; Stanley Fleishman; Doris
Fleishman; Ben Margolis; Valerie Margolis; Florence Ain;
Milton London, M.D.; Leah London; Murray J. Goldberg;
Genevieve Goldberg; Meyer Zeiler, M.D.; Floria Zeiler;
James Ryan; Judith Ryan; Eddie Allee; Leta Allee; Robert
Brock; Marjorie Brock and Norman Pitt, Individually, Appellants.
 No. 85-1257.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 16, 1986.
Decided July 21, 1986.
 
 Benjamin Margolis, Los Angeles, Cal., for appellants.
 Billy S. Clark, Little Rock, Ark., for appellees.
 Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ROSS, Circuit Judge.
 LAY, Chief Judge.
 
 
 1
 This is a complex contract action relating to the construction of an experimental plant in Stuttgart, Arkansas, for the combustion of rice hulls in a pollution-free manner with the production of steam and a commercially valuable ash as by-products. The basic issue in this appeal is whether the district court[1] erred in holding Alchemy Industries, Inc. (Alchemy) and Norman Pitt, Inc. (Pitt, Inc.) responsible for the inability of the plant to work properly and in holding the individual defendants liable under a guarantee contract. We affirm the district court's finding that Alchemy and Pitt, Inc. are liable to Riceland for breach of contract, but reverse the finding of liability against the individual defendants for lack of personal jurisdiction.
 
 Background
 
 2
 Alchemy possessed the rights to a new process for the combustion of rice hulls that had been developed by Norman Pitt and his company, Norman Pitt, Inc. In 1972, Alchemy and Arkansas Rice Growers Cooperative Association, d/b/a Riceland Foods (Riceland) entered into a contract for the construction of a factory in Stuttgart that would burn rice hulls and a separate but related contract regarding the marketing of the ash by-product. The construction contract provided that Alchemy should enter into a contract with Pitt, Inc. under which Pitt, Inc. would provide Riceland with "the necessary engineering plant layout and equipment design and the onsite engineering supervision and start up engineering services necessary for the construction of a hull by-product facility capable of reducing a minimum of 7 1/2 tons of rice hulls per hour to an ash and producing a minimum of 48 million BTU's per hour of steam at 200 pounds pressure." The contract further provided that Riceland would construct the facility at its sole expense and would operate the facility in accordance with the instructions and procedures provided by Alchemy. Under the ash marketing agreement, Riceland granted to Alchemy the exclusive right to obtain all ash produced at the Stuttgart facility and agreed to burn the rice hulls according to the directions of Alchemy.
 
 
 3
 After Pitt, Inc. furnished Riceland with plans for the design of the facility, Riceland, acting as its own general contractor, began construction of the facility in August 1974. The facility was completed in December 1975, and Riceland commenced operation of the plant. Although the plant was designed to operate every day on a twenty-four hour basis, it never performed as anticipated by the parties. The plant was repeatedly shut down because of a build up of hulls in the furnace and an inability to comply with state air pollution control standards. Although the plant was intended to operate on rice hulls alone, the desired consistency of the ash could not be achieved without the use of fuel oil in addition to hulls. After unsuccessfully attempting to operate the plant for three years, Riceland closed the plant in September 1978.
 
 
 4
 Riceland filed suit against Alchemy and Pitt, Inc. in 1978 for breach of contract and negligent design, claiming $3,017,500.00 in damages. Riceland also brought suit against certain individuals (the "individual defendants")[2], who Riceland contended had personally guaranteed the construction contract, for failure to honor the guarantee. Alchemy counterclaimed, contending that Riceland had breached both the construction and the marketing contract, resulting in damages in excess of ten million dollars. After trial to the district court, the court made extensive findings of fact in two separate opinions. In its opinion on liability, the district court determined that Alchemy and Pitt, Inc. had breached the construction contract and that the individual defendants had given Riceland personal guarantees that were still in effect. The district court found against Alchemy on its counterclaim. In its memorandum opinion on damages, the district court allowed Riceland to recover the construction costs of the plant, less certain deductions for items not attributable to Alchemy and Pitt, Inc., but did not allow Riceland to recover the costs of operating the plant. Alchemy, Pitt, Inc., and the individual defendants (referred to collectively as the "defendants") appeal.
 
 
 5
 We will not attempt here to detail the extensive evidence set forth by the district court. Instead, we initially analyze the district court's conclusion that Alchemy and Pitt, Inc. breached the construction contract and then determine whether the evidence supports the district court's findings and conclusions on this issue. We thereafter take up (1) the determination of damages attributable to Alchemy and Pitt, Inc., and (2) the liability of the individual defendants.[3]
 
 
 6
 I. Liability of Alchemy and Pitt, Inc. for Breach of Contract
 
 
 7
 Pursuant to the express terms of the contracts, California law governs all questions of state law. It is well settled that the construction and legal effect of a contract are questions of law subject to de novo review. E.g., Osborne v. Cal-Am Financial Corp., 80 Cal.App.3d 259, 267, 145 Cal.Rptr. 584, 589 (1978). To the extent that the meaning of the contract depends on disputed extrinsic evidence, however, it constitutes a finding of fact, LaCount v. Hensel Phelps Construction Co., 79 Cal.App.3d 754, 770, 145 Cal.Rptr. 244, 253 (1978), subject to review on appeal under the clearly erroneous rule, Fed.R.Civ.P. 52(a). District court findings as to what the parties said or did must also be accepted on appeal unless clearly errorneous. InterPetrol Bermuda Ltd. v. Kaiser Aluminum International Co., 719 F.2d 992, 998 (9th Cir.1983). With these standards of review in mind, we turn to the findings and conclusions of the district court.
 
 
 8
 The district court's findings regarding the liability of Alchemy and Pitt, Inc. for breach of the construction contract can be summarized as follows. Alchemy and Pitt, Inc. were obligated under the construction contract to provide Riceland with the design for the construction of a plant capable of achieving the performance criteria on a sustained basis, without the need for any fuel other than the rice hulls.[4] The trial court found that the facility never had the ability to achieve the performance criteria on a sustained basis and could not produce an ash satisfactory to Alchemy without the use of fuel oil in addition to the rice hulls because of the faulty and inadequate design provided by Pitt, Inc. According to the district court, the primary reason that the plant could not operate as warranted was that the furnace system, for which Pitt, Inc. admits responsibility, could not support combustion at a temperature low enough to produce quality ash without the aid of fuel oil when the outside temperature fell below fifty degrees Fahrenheit.
 
 
 9
 The district court recognized that not all of the plant's problems were attributable to Alchemy and Pitt, Inc. Most notably, much of the equipment supplied by Polutrol, Inc., (Polutrol) the company selected by Riceland to supply the boilers and the air pollution control system, was inadequately designed and poorly manufactured. The parties agree, and the district court found, that the air pollution control system supplied by Polutrol did not allow the facility to operate in compliance with the state air pollution control regulations as required by the construction contract. Moreover, Polutrol failed to take the abrasive quality of the ash into account when manufacturing the boilers, and the boilers thus deteriorated and were in need of replacement at the time Riceland permanently shut down the plant. The district court determined, however, that although Alchemy and Pitt, Inc. were not responsible for the damage or loss caused by the defective Polutrol equipment, the evidence established that Pitt, Inc.'s design would not have produced a plant capable of achieving the performance criteria even had the Polutrol equipment not been defective. As to the non-erosion problems caused by the boilers, such as the difficulty of controlling the water levels in the boilers and its system-wide repercussions, the district court found that Alchemy and Pitt, Inc. were responsible. The court explained that because Pitt, Inc. had approved the water-tube boiler design suggested by Polutrol, the water-tube boilers had become a part of Pitt, Inc.'s design.
 
 
 10
 The district court also found against Alchemy on its counterclaim for breach of contract against Riceland. Alchemy had urged at trial that Riceland had breached both the construction contract and the marketing contract because Riceland closed down the plant and thus did not pay Alchemy royalties for the use of Pitt, Inc.'s process as promised in the construction contract or provide Alchemy with the ash as provided in the marketing agreement. Moreover, Alchemy asserted, the failure of the plant to operate as anticipated was due to the defective equipment provided by Polutrol for which Alchemy claimed Riceland was responsible. In rejecting Alchemy's counterclaim, the district court relied on the findings it had made in connection with Riceland's claim against Alchemy and Pitt, Inc. The district court first noted that Polutrol's errors were limited to the abrasion-erosion problems of the boilers and the air pollution control system. Even had these problems been corrected, the district court stated, the plant could not have achieved the performance criteria because of the design deficiencies attributable to Alchemy and Pitt, Inc. The district court further held that although Polutrol's errors in designing and constructing certain equipment could be used as a partial defense to Riceland's action against Alchemy and Pitt, Inc., justifying a reduction of damages, Polutrol's errors could not be affirmatively raised by Alchemy as grounds for asserting that Riceland was in breach of contract. As designer of the facility, the district court determined, Pitt, Inc. was responsible for ensuring that any equipment provided by a third party would not have adverse effects on other parts of the facility, and Riceland could thus not be held affirmatively liable for errors of design made by third parties where Alchemy and Pitt, Inc. had approved such design delegation.
 
 
 11
 In contesting the district court's allocation of liability under the contracts on appeal, the defendants seek to prevail on Riceland's claim against them by prevailing on Alchemy's counterclaim against Riceland. More specifically, defendants argue that the district court erred in determining that Riceland is not responsible for the deficiencies in the Polutrol equipment. Defendants contend that Alchemy and Pitt, Inc. were only responsible for providing the furnace and the general requirements for the other equipment. As general contractor, defendants argue, Riceland was responsible for providing equipment that met the general requirements. Because Polutrol's equipment did not meet the general requirements of Pitt, Inc.'s design, defendants contend, Riceland committed a material breach of the construction contract. Defendants then argue that since Riceland breached the contract first, Riceland may not recover against the defendants for breach of contract under California law, regardless of whether the defendants also breached the contract. In short, defendants contend that Riceland's failure to construct a facility that conformed to Pitt, Inc.'s design breached its contracts with Alchemy. Concomitantly, Alchemy and Pitt, Inc.'s obligation to render the plant operational according to the performance criteria never arose because Riceland never completed the construction of such a facility.
 
 
 12
 We have carefully reviewed the trial court's findings of fact and the contracts entered into by the parties, and we conclude that the district court did not err in placing liability on Alchemy and Pitt, Inc. for the failure of the plant to operate as anticipated by the parties. The construction contract obligated Alchemy and Pitt, Inc. to provide "the necessary engineering plant layout and equipment design and the onsite engineering supervision and start up engineering services" for the construction of a hull-burning plant capable of achieving the performance criteria. Alchemy and Pitt, Inc. thus warranted that a plant constructed according to Pitt, Inc.'s design was capable of achieving the performance criteria. See United States v. Spearin, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) (a party who furnishes plans and specifications warrants their sufficiency for the purpose in view); Centex Construction Co. v. James, 374 F.2d 921, 924 (8th Cir.1967). The evidence is undisputed that the plant was never capable of achieving the performance criteria on a sustained basis. The district court found, and we agree, that the primary reason the plant could not perform as anticipated was that the furnace system designed by Pitt, Inc. could not perform properly when the outside temperature was less than fifty degrees. This finding is supported by the report of Pitt, Inc.'s own engineer who, after inspecting the facility upon Riceland's request in 1978, concluded that the furnace could not maintain combustion without the use of substantial amounts of fuel oil. It is true that the inadequacy of the air pollution control equipment provided by Polutrol and the failure of Polutrol to take the abrasive quality of the ash into account in manufacturing the boilers contributed to the plant's problems. As the district court observed, however, the problems attributable to the faulty air pollution control system and the failure of the boilers to withstand the abrasiveness of the ash did not manifest themselves until several years after it was evident that the plant was incapable of achieving the performance criteria on a sustained basis. We thus agree with the district court that "even if the equipment provided by Polutrol had met the specifications established by Mr. Pitt and had operated properly, still the entire plant would not have been able to perform in accordance with the terms of the contract because of deficiencies in Mr. Pitt's design." We therefore affirm the district court's finding that Alchemy and Pitt, Inc. are liable to Riceland for breaching the warranty in the construction contract.[5] Our conclusion that the plant would not have operated properly because of Pitt, Inc.'s inadequate design even had the Polutrol equipment been properly manufactured also answers the defendants' contention that Riceland itself substantially breached the construction contract and is thus precluded from recovering on its claim because of Polutrol's errors. Because Pitt, Inc's design was itself defective and insufficient, it is in this sense irrelevant whether Riceland committed minor breaches in its obligation to build the plant according to Pitt, Inc.'s instructions.
 
 
 13
 We also agree with the district court, for the reasons discussed above, that Alchemy may not recover on its counterclaim against Riceland. The marketing contract expressly provides that Riceland assumes no responsibility for the quality of the ash produced as a result of following Alchemy's directions. The district court found, and we agree, that Riceland at all times operated the plant according to Alchemy's and Pitt, Inc.'s instructions.[6] Alchemy's contention that Riceland breached the contracts by shutting down the plant in September 1978, not allowing Alchemy and Pitt, Inc. to make further attempts at rendering the plant operational, and not spending the estimated $650,000 necessary to replace the air pollution control system and the worn-out boilers is simply without merit. Clearly, Riceland did not breach either the construction contract or the marketing contract when, after expending funds far in excess of the expenditures initially contemplated by the parties and allowing Alchemy and Pitt, Inc. three years following construction of the facility in which to render the plant operational, it finally shut the plant down rather than expending additional funds on a plant that would never work as anticipated because of a defective design. Alchemy's failure to provide a design capable of achieving the performance criteria constituted a material breach of the contract, discharging Riceland from all further obligation under the contracts. See Haskell v. McHenry, 4 Cal. 411, 411 (1854); see also Wells Benz, Inc. v. United States, 333 F.2d 89, 92-93 (9th Cir.1964) (applying California law).
 
 II. Damages
 
 14
 After a supplementary trial on damages, the district court issued a second memorandum opinion explaining its damage determination. In general, the district court allowed Riceland to recover the costs of constructing the plant, less the costs attributable to Polutrol's errors and a few other deductions, but not the expenses of operating the plant. More specifically, the court deducted from Riceland's estimate of the overall construction costs the cost of the air pollution control system, one third of the cost of the boilers, and fifteen percent of the cost of boiler-related items. The trial court also deducted from Riceland's estimate of the total construction costs financing charges, the cost of a hull storage tank, the cost of certain back up equipment, and the estimated salvage value of the plant and equipment. Finally, the district court allowed Alchemy and Pitt, Inc. a twenty percent deduction of the amount remaining after the above deductions to reflect the adverse effects of the defective Polutrol equipment on the operation of the plant as a whole. The district court entered judgment against Alchemy and Pitt, Inc. for $1,493,562.
 
 
 15
 Neither party disputes on appeal the district court's basic approach to the determination of damages. Instead, Alchemy and Pitt, Inc. argue that there is no factual basis for the district court's determination of the percentages it deducted from the overall construction costs. In reviewing the defendants' contention, we initially note that a district court has wide discretion in determining the amount of damages to award for breach of contract under California law. Distillers Distributing Corp. v. J.C. Millett Co., 310 F.2d 162, 165 (9th Cir.1962) (applying California law). A district court's determination of damages will not be overturned on appeal unless clearly erroneous. Taylor v. Pre-Fab Transit Co., 616 F.2d 374, 375 (8th Cir.1980); Apex Mining Co. v. Chicago Copper & Chemical Co., 340 F.2d 985, 987 (8th Cir.1965). After reviewing the extensive evidence presented by both parties at the supplementary hearing, we hold that the district court's findings on the amount of damages are not clearly erroneous. It is true that the district court estimated the percentage of costs that were attributable to the defects of the Polutrol equipment and that should thus be deducted from the overall construction costs. This was necessarily so because the exact amount of the damages attributable to the Polutrol equipment was impossible to determine. Once the existence, nature, and cause of damages has been established, however, a court will not deny recovery simply because the exact amount of damages is difficult to ascertain. Rovetti v. City and County of San Francisco, 131 Cal.App.3d 973, 980, 183 Cal.Rptr. 1, 4 (1982); Stephan v. Maloof, 274 Cal.App.2d 843, 79 Cal.Rptr. 461, 465 (1969); California Lettuce Growers, Inc. v. Union Sugar Co., 45 Cal.2d 474, 289 P.2d 785, 793 (1955); see also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount). In this case, the parties presented extensive evidence on damages to the district court over the course of two days and submitted supplemental briefs to the district court explaining and analyzing their respective theories on damages. The parties acknowledged on several occasions that the district court had an excellent understanding of the evidence presented at trial and the theories advocated by the parties. We find ample support in the record for the district court's findings on damages and thus hold that the district court's findings are not clearly erroneous.
 
 III. Liability of the Individual Defendants
 
 16
 Article seven of the construction contract provides that
 
 
 17
 Alchemy shall provide to Riceland financial assurances either in the form of personal guarantees satisfactory to Riceland or in the form of a line of credit from a bank or other financial institution, in an amount equal to the cost of the facility to be designed by Norman Pitt, Inc., based upon the cost of such facility (estimated prior to construction) plus ten percent (10%) thereof. Such guarantees or line of credit shall remain in effect for a period of twelve (12) months following the date that the facility becomes operational.
 
 
 18
 Riceland agreed to accept $500,000 in financial assurances. According to the undisputed evidence, twenty-two individuals executed personal guarantees to Union Bank in California, which then issued a letter of credit to Riceland guaranteeing Alchemy's performance of the contract.[7] Riceland brought suit against these individual defendants,[8] contending that the personal guarantees executed by those individuals ran in favor of both the bank and Riceland. The district court agreed and entered judgment against the twenty-two individual defendants for $500,000 plus $286,712 in prejudgment interest. The individual defendants contend on appeal that the district court erred in holding that Arkansas had personal jurisdiction over them, in holding that the personal guarantees ran in favor of the bank and Riceland, and in awarding Riceland prejudgment interest.
 
 
 19
 Because the determination of whether the personal guarantees run in favor of Riceland may affect the question of personal jurisdiction over the individual defendants, we initially assume for the purposes of argument that the guarantees run in favor of the bank and Riceland. The facts relevant to the personal jurisdiction issue are as follows. Structural Materials Partnership, a California limited partnership that possessed the rights to Norman Pitt's design for the hull-burning facility, began negotiations with Riceland in the summer of 1972 for the construction of the hull-burning facility in Stuttgart. In October 1972, Structural licensed Pitt, Inc.'s design to Alchemy, a corporation formed by some of the Structural partners. Alchemy continued the negotiations with Riceland for the hull-burning facility, and Riceland and Alchemy executed the construction and marketing contracts discussed above in December 1972. In April 1973, Alchemy sent Riceland a list of twenty-four individuals, all residents of California, who would sign the guarantee contract. Twenty-two of those twenty-four executed guarantees on May 1, 1973.
 
 
 20
 In 1979, the district court[9] issued an opinion denying the individual defendants' motion to quash service for lack of personal jurisdiction. The district court determined that Arkansas had jurisdiction over the guarantors under the Arkansas long-arm statute[10] and that the assertion of jurisdiction did not offend due process.[11] In reaching this conclusion, the district court found that there was virtual identity among the guarantors, the Structural partners, and Alchemy. The district court further found that Structural initiated the transaction with Riceland, and that Riceland relied on the financial statements and guarantees of the individual defendants in entering into the construction and marketing contracts. Although only three of the defendant guarantors--Norman Pitt, Ben Margolis, and Robert Kahan--had gone to Arkansas in the course of this transaction, the district court determined that those three guarantors were acting as agents of the other partners of Structural and thus as agents of the other guarantors. In short, the district court concluded that the guarantors had purposefully availed themselves of the privilege of conducting activities in Arkansas because the guarantors stood to profit from the transaction their guarantees made possible by virtue of their status as partners in Structural and shareholders in Alchemy.[12]
 
 
 21
 The district court's assertion of personal jurisdiction over the individual guarantors rests on several erroneous factual findings. The substantive identity of the guarantors, Alchemy, and Structural, on which the district court premised its finding of jurisdiction, simply does not exist. Contrary to the district court's findings, only nine of the guarantors were partners in Structural, and although there is some overlap in identity of the Structural partners and the Alchemy shareholders, the two entities are by no means identical. Of the twenty-nine partners in Structural in August 1972, only thirteen were among Alchemy's approximately seventy shareholders. The lack of identity between the Structural partners and the guarantors also demonstrates the error in the district court's finding that Margolis, Pitt, and Kahan went to Arkansas as agents of the guarantors, subjecting the guarantors to the jurisdiction of the Arkansas courts.
 
 
 22
 In concluding that the assertion of jurisdiction over the guarantors would not offend due process, the district court also relied on the fact that Alchemy had provided Riceland with the financial statements of the prospective guarantors in August 1972 and that Riceland entered into the construction and marketing contracts with Alchemy in reliance on this information. The evidence shows, however, that the financial statements Riceland received in August 1972 were those of the Structural partners. Riceland thus had the financial statements of only nine of the eventual twenty-two guarantors when it entered into the construction and marketing contracts.[13] Furthermore, not until April 1973, after Riceland had executed the contracts, did Riceland receive a list of the prospective guarantors.
 
 
 23
 Under these circumstances, we hold that there are insufficient contacts between the guarantors and Arkansas to subject the guarantors to the jurisdiction of the Arkansas courts. The mere fact that the individual defendants guaranteed an obligation to an Arkansas corporation does not subject the guarantors to jurisdiction in Arkansas. See Arkansas Poultry Cooperative, Inc. v. Red Barn System, Inc., 468 F.2d 538, 540-41 (8th Cir.1972). Nor does the guarantors' status as shareholders in Alchemy, the debtor corporation, or the more remote connection between some of the guarantors and Structural, establish the minimum contacts between the guarantors and Arkansas necessary to satisfy due process. See, e.g., Johnson Creative Arts, Inc. v. Wool Masters, Inc., 573 F.Supp. 1106, 1111 (D.Mass.1983), aff'd, 743 F.2d 947 (1st Cir.1984); Mergenthaler Linotype Co. v. Leonard Storch, 66 Ill.App.3d 789, 23 Ill.Dec. 352, 358, 383 N.E.2d 1379, 1385 (1978). It is true that the guarantors stood to profit if the construction contract, the performance of which they guaranteed, was successful. This has been, in part, the basis for finding that the assertion of jurisdiction over nonresident guarantors comports with due process in some cases. See, e.g., National Can Corp. v. K Beverage Co., 674 F.2d 1134, 1137 (6th Cir.1982); Marathon Metallic Building Co. v. Mountain Empire Construction Co., 653 F.2d 921, 923 (5th Cir.1981) (per curiam). In these cases, however, there has been substantive identity of the guarantors and the corporation whose obligation they guarantee, National Can, 674 F.2d at 1138, evidence that the beneficiary of the guarantee contract would not have entered into the transaction without the guarantees of specific individuals, id., or a provision in the guarantee contract or the underlying contract stating that the law of the forum state would control, Marathon Metallic, 653 F.2d at 923. We have found no case in which a court has asserted jurisdiction over a nonresident guarantor merely because the guarantor is a passive investor in the corporation whose debt the guarantor assures.
 
 
 24
 The fact that three of the guarantors--Norman Pitt, Ben Margolis, and Robert Kahan--went to Arkansas on one or more occasions does not change our holding that there are insufficient contacts between the guarantors and Arkansas either as to the guarantors in general or as to those three particular guarantors. The law is clear that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity. See, e.g., Escude Cruze v. Ortho Pharmaceutical Corp., 619 F.2d 902, 906 (1st Cir.1980); Forsythe v. Overmyer, 576 F.2d 779, 783-84 (9th Cir.), cert. denied, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). In this case, Pitt, Margolis, and Kahan went to Arkansas on behalf of Structural and later Alchemy, not in their individual capacities. Moreover, there is no evidence to suggest that these three guarantors "personally interjected" themselves into the negotiations between Riceland and Structural or Alchemy, a situation in which some courts have asserted personal jurisdiction over a nonresident guarantor who was also an officer or agent of the debtor corporation. See Forsythe, 576 F.2d at 784. We therefore hold that the guarantors had insufficient contact with the forum state to subject them to personal jurisdiction in Arkansas. Having so concluded, we need not consider whether in fact the guarantee extended to Riceland or whether the district court properly awarded Riceland prejudgment interest.
 
 Conclusion
 
 25
 For the reasons set forth above, we affirm the judgment for breach of contract against Alchemy Industries, Inc. and Norman Pitt, Inc. We vacate the judgment against the individual defendants for lack of personal jurisdiction.
 
 
 
 [1]
 The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 The facts surrounding the guarantee and the individual defendants involved in this count of Riceland's complaint are set out more fully in Part III
 
 
 [3]
 The defendants also argue that the trial judge erroneously refused to recuse himself. Finding this contention utterly without merit, we do not address this issue here
 
 
 [4]
 The district court determined that Riceland was the third-party beneficiary of the contract between Alchemy and Pitt, Inc., pursuant to which Pitt, Inc. agreed to provide the engineering and design services necessary for the construction of the plant. Pitt, Inc. does not dispute this finding
 
 
 [5]
 As we note in our discussion of damages, however, see Part II, the construction contract expressly precludes Riceland from recovering for the failure of the plant to comply with the air pollution control regulations because Riceland chose to depart from Pitt, Inc.'s design for the air pollution control system
 
 
 [6]
 The indemnification clause in the construction contract and the marketing contract, although not specifically relied on by the district court, also supports the district court's conclusion. The indemnification clause provides that Alchemy will "hold Riceland harmless from liability, loss or damage resulting from the failure of the facility to perform in accordance with the requirements of this Agreement."
 
 
 [7]
 Riceland brought suit against Union Bank in California for failure to honor the letter of credit. The California proceeding is apparently stayed pending outcome of the liability determination in this case
 
 
 [8]
 Riceland initially brought suit against twenty-four individuals who Riceland contended had signed guarantees. The district court found that two of those defendants did not sign a guarantee and thus dismissed them from the case. Riceland did not appeal this dismissal
 The twenty-two remaining individual defendants are: Sol Balkin, Janelle Balkin, Seymour DiMatoff, Eleanor DiMatoff, Robert Kahan, Dorothy E. Kahan, Stanley Fleishman, Doris Fleishman, Ben Margolis, Valerie Margolis, Florence Ain, Milton London, M.D., Leah London, Murray J. Goldberg, Genevieve Goldberg, Meyer Zeiler, M.D., Floria Zeiler, Eddie Allee, Leta Allee, Robert Brock, Marjorie Brock, and Norman Pitt.
 
 
 [9]
 The Honorable Oren Harris, Senior United States District Judge for the Eastern District of Arkansas, initially presided over the proceedings before the case was transferred to Judge Eisele
 
 
 [10]
 The Arkansas long arm statute allows Arkansas courts to assert jurisdiction over any nonresident who, acting directly or by an agent, transacts any business in Arkansas or contracts to supply services or things in Arkansas as to a cause of action arising from such conduct. Ark.Stat.Ann. Sec. 27-2502 C(1)(a), (b) (1979)
 
 
 [11]
 Because the Arkansas long-arm statute was intended to expand the jurisdiction of Arkansas courts to the modern constitutional limits, the district court primarily considered whether there were sufficient "minimum contacts" between the nonresident guarantors and Arkansas such that the assertion of personal jurisdiction over the guarantors would not offend due process. See Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 653-54 (8th Cir.1982)
 
 
 [12]
 Judge Eisele relied on Judge Harris' opinion in denying the guarantors' later request for reconsideration of their motion to quash service. Judge Eisele also relied on Judge Harris' opinion in finding jurisdiction over the guarantors in his memorandum opinion on liability
 
 
 [13]
 Even assuming that the wives of the Structural partners who were themselves guarantors had the same financial statements as their husbands, Riceland had the financial statements of only seventeen of the twenty-two guarantors when it signed the contracts in December 1972