Filed 2/27/14  Van Vliet v. Escobar CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WILLIAM VAN VLIET AND LINDA VAN VLIET, | B245655 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC107657) |
| v. | |
| SEBASTIAN ESCOBAR, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, John H. Reid, Judge.  Affirmed.

Jacobs & Jacobs, Stanley K. Jacobs, Thomas F. Borcher; Stoll, Nussbaum & Polakov, Matthew Stoll for Plaintiffs and Appellants.

Shaver, Korff & Castronovo, Thomas W. Shaver, and Tod M. Castronovo for Defendant and Respondent.

## INTRODUCTION

Plaintiffs and appellants William Van Vliet and Linda Van Vliet[1] appeal from a judgment entered in their favor against defendant and respondent Sebastian Escobar in the sum of $15,000 for each plaintiff. The judgment was entered based on the trial court's conclusion, after a bench trial, that defendant's affirmative defense—the parties entered into a settlement and compromise agreement—was determinative. Plaintiffs contend that the trial court erred its ruling. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 2009, William was operating a 2008 Harley Davidson on which Linda was a passenger when they were involved in a multi-vehicle accident involving defendant (accident). Defendant was insured under an automobile policy issued by Alliance United Insurance Company (Alliance United).

On March 24, 2010, plaintiffs, through their counsel, sent a letter to Alliance United, stating, "On October 9, 2009, we offered to settle our clients' claims for policy limits of your insured provided that those limits were $100,000 or less. [¶] On October 19, 2009, you attempted to accept our policy limits offer based upon your representation that [defendant's] insurance coverage limit was $15,000/30,000. However, you conditioned your acceptance by requiring our clients to enter into an agreement with an alleged third claimant [Renata Pereria] to accept the $30,000 payment and divided it among themselves with no one claimant receiving more than $15,000. Your condition constituted a counter-offer and this was a rejection of my clients' offer to settle for policy limits. [¶] . . . [¶] As purely a courtesy on my part, I am giving you one last opportunity to pay the policy limits to my clients without conditioning it on Ms. Pereria's participation in the settlement. If you choose to pay those policy limits solely to our clients, we agree that the settlement is inclusive of any and all liens and will include any

---

[1]     Because plaintiffs share the same surname, they are referred to separately by their first names.

claims of loss of consortium, provided that you accept this offer in writing received by my office no later than April 7, 2010."

On April 1, 2010, Alliance United sent a letter to plaintiffs' counsel stating, "In response to your correspondence dated March 24, 2010, we have agreed to accept settlement of your client[s'] injury claim for our insured policy limits of $15,000 per person, $30,000 maximum aggregate (per accident). This settlement is inclusive of any and all liens, including loss of consortium, as indicated in your correspondence. Enclosed you will find a Release of All Claims for each of your clients to execute. Please have your clients sign and date the enclosed Release and return it to me as soon as possible. [¶] . . . [¶] We will send the settlement draft out to you on the next business day after receiving the signed release and your [W-9 Request for Taxpayer Identification Number and Certification] form. Thank you for your assistance in bringing this matter to an amicable conclusion."

Alliance United's April 1, 2010, letter enclosed two identical releases— one for each of the two plaintiffs to sign. Each of the releases were captioned as a "RELEASE OF ALL CLAIMS," and stated, **"FOR AND IN CONSIDERATION of delivery of a draft or check in the sum of Fifteen Thousand Dollars only ($15,000.00)** . . . I/we [plaintiff] . . . do hereby release, acquit and forever discharge [defendant], **Janet Escobar and Luis Escobar**, his/her/it's agents, representatives, successors and assigns of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation, on account of or in any way growing out of any and all known and unknown personal injuries and property or other damage resulting from an accident that occurred on or about September 27, 2009 at or near Pacific Coast Highway, City of Malibu, CA. [¶] I further represent that should any outstanding liens exist against the proceeds of this settlement, I am wholly responsible for their satisfaction. I agree to indemnify, hold harmless and defend [defendant], Janet Escobar and Luis Escobar his/her/it's related individuals and entities, their insurer or insurers, and attorneys, for any amounts of said lien or liens. [¶] **It is understood and agreed that all rights under section 1542 of the Civil Code of California [w]hich provides as follows,**

3

**'CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE—A general release does not extend to the claims where the Creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with Debtor,' are hereby expressly waived. [¶] . . . [¶] This release agreement contains the entire agreement between the parties hereto, and the terms of this release are contractual and not a mere recital."**

On April 19, 2010, plaintiffs filed a complaint, arising out of the accident, for personal injuries and property damage against defendant and others alleging causes of action for "motor vehicle," general negligence and negligence per se. Defendant answered the complaint alleging, inter alia, an affirmative defense of compromise settlement.

On July 20, 2010, Alliance United sent a letter to plaintiffs' counsel stating, "It has come to our attention that the Releases issued to your office under our letter of April 1, 2010 inadvertently included reference to property damage. [¶] As clearly indicated in our cover letter, the release[s were] intended to cover only the bodily injury claim as we were accepting the terms of your March 24, 2010 letter. That letter referenced your clients' injury claim only and it was our intention to accept those terms. [¶] Enclosed please find corrected releases for your clients to execute and return to our office so that the settlement checks can be issued."

The July 20, 2010, letter again enclosed two identical releases—one for each of the two plaintiffs to sign. The releases attached to the July 20, 2010, letter were identical to the releases attached to Alliance United's April 1, 2010, except that they were captioned as a "RELEASE OF BODILY INJURY CLAIM," and deleted the phrase "and property or other damage" from the claims being released.

On July 21, 2010, Alliance United sent a letter to plaintiffs' counsel stating, "In regards to the issue you raise about our April 1, 2010 letter enclosing releases that included property damage language, I believe that I addressed those concerns in [one of] my [prior letters]. In order to assist you regarding your concerns, under separate cover

4

you will receive releases that have deleted the reference to 'property damage.' The original 'general release[s]' [were] sent out with a clerical error that inadvertently included property damage language. However, the cover letter clearly outlined our intent."

On April 16, 2012, in a bifurcated trial, the trial court conducted a bench trial solely on the issue of defendant's affirmative defense of compromise settlement. At the trial, the parties stipulated that had defendant testified, he would have testified that prior to March 19, 2010, defendant met with one of his attorneys and defendant agreed as to his insurance policy with Alliance United, that "Alliance United Insurance Company could deplete the full $15,000 per person bodily injury limits and **$30,000** per accident bodily injury limits to resolve the bodily injury claims of [plaintiffs] . . . and leave essentially out there a prospective bodily injury claim of a third person known as Ms. Pereira."

During trial, plaintiffs' counsel stated that plaintiffs' March 24, 2010, letter was an offer to settle plaintiffs' bodily injury claims, and it did not offer to settle plaintiffs' property damage claims or any other claims they may have had. Plaintiffs' counsel conceded that prior to March 24, 2010, there never were any settlement discussions that "dealt with" property damage, and insurance companies are "entitled to get a release of the claim that they are settling."

Satyan Jethwa testified that he was employed by Alliance United from May 2009 to September 2011; worked for four insurance companies prior to being employed by Alliance United, for whom he "handled claims" and settled bodily injury and property damages cases; and attended law school from September 1996 to May 1997.

Jethwa testified that he caused the April 1, 2010 letter to be sent, and the releases enclosed with that letter were from preprinted forms. The only information he inputted on those release forms were the amount of the settlement, the names of the settling parties, and the date and location of the accident. The trial court overruled plaintiffs' motion to strike Jethwa's testimony concerning the matters he inputted on the release forms made on the grounds of relevance.

Jethwa said that he did not completely read the releases attached to the April 1, 2010, before they were sent to plaintiffs, and as of April 1, 2010, he did not have an understanding what an "integration clause" meant. He did not intend for the releases attached to the April 1, 2010, letter to include a release of property damages claims; the settlement agreement "was for bodily injury only." He therefore prepared the July 20, 2010, letter. Plaintiffs' counsel stated that plaintiffs do not contend that Jethwa intentionally tried "to pull a fast one" by attempting to obtain from plaintiffs a release of their property damage claims—"I don't have to show that."

David Edwards, a branch manager for Alliance United at the time of plaintiffs' accident, testified that Jethwa was employed by Alliance United as a claims examiner, and Jethwa was assigned to plaintiffs' claims against defendant's insurance policy. Before Alliance United sent the April 1, 2010, letter to plaintiffs' counsel, Edwards and Jethwa discussed their response to the March 24, 2010, letter from plaintiffs' counsel.

Edwards testified that at the time Alliance United sent the April 1, 2010, letter to plaintiffs' counsel, Alliance United had a release of "all claims" form that it used when it settled claims, but after April 1, 2010, the release form was modified to create a "bodily injury-only release." Regarding Alliance United's release of all claims form, Jethwa could have changed the form from saying it was a release of "ALL CLAIMS" to a release of "BODILY INJURY CLAIMS," and he could have deleted from the release of all claims form the phrase "and property or other damage." Alliance United's "intent in sending the [April 1, 2010,] letter" was to accept "the offer to settle the bodily injury claim." In accepting plaintiffs' settlement offer, there were no discussions that he wanted "to cover" concerning not only the personal injury claims, but also the property damage claims. Edwards testified that he was not "trying to be sneaky and settle the property damage" claims.

Edwards said that before plaintiffs received Alliance United's April 1, 2010, letter, he was aware that each of the releases provided to plaintiffs included the language that, "This release agreement contains the entire agreement between the parties hereto, and the terms of this release are contractual and not a mere recital." It is his understanding that

6

such language means "that the deal you are making is contained solely within the release."

The trial court said to plaintiffs' counsel during the trial, "[A]ll the communication was for 15/30 for bodily injury and both sides agreed to that, [and] you have injected into this release 'all claims of property damage,' yet there . . . was never a discussion of property damage, and if you are then alluding to the last paragraph that says, 'we will send out a draft to you after we receive all releases, that has nothing to do with the substance of resolving the claim for 15/30. It is a mechanism to complete the settlement." The trial court also stated, "'The April 1st letter by [Jethwa] is clear in response to your correspondence dated March 24th, 2010. We have agreed to accept settlement of your client[s'] injury claim[s].' [¶] . . . [¶] The response letter [states], 'we accept [the March 24, 2010, demand],'" and here, 'send the releases,' which is a vehicle to get the money exchanged in performing on the contract. [¶] . . . [¶] [T]he agreement is, 'we accept. We will pay the 15/30 bodily injury.'"

The trial court found "that there has been a settlement of bodily injury claim," stating, "[T]he court is going to find that the intent by both parties, [plaintiffs' counsel] and Alliance [United], was to settle the bodily injury claim for 15/30. . . . [¶] . . . [¶] [T]his is the acceptance, and the agreement was for bodily injuries, period. [¶] . . . [¶] I have not before me the property damage. This is not—I don't believe it is the defense that the property damage has been settled. It is only bodily injury that has been settled. [¶] . . . [¶] The vehicle to get the money exchanged and releases is where the breakdown was. [¶] . . . [¶] [I]t can't be a judgment because the judgment has to be one judgment. All I found is that there has been a settlement of the bodily injury claim and the complaint calls for property damage."

Plaintiffs' dismissed the balance of their complaint for property damage with prejudice,[2] and the trial court entered judgment on defendant's affirmative defense

---

**2**      Plaintiff states that, "Alliance United eventually paid [plaintiffs]' personal property damage claim."

stating the each of the plaintiffs are to recover $15,000 from defendant. Plaintiffs timely appealed.

## DISCUSSION

The trial court found that based on the March 24, 2010, letter and the April 1, 2010, letter, the parties entered into an agreement to settle plaintiffs' bodily injury claims, and the releases attached to the April 1, 2010, letter were merely "mechanism[s]" or "vehicle[s] to get the money exchanged in performing the contract." We agree. The reasonable meaning of the parties' words and actions constituted mutual assent to settle plaintiffs' bodily injury claims.

"Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.'" (*Bustamante v. Intuit, Inc*. (2006) 141 Cal.App.4th 199, 208, quoting Civ. Code, § 1580; see Civ. Code, §§ 1550, 1565.) The manifestation of mutual consent is usually achieved through the process of offer and acceptance. (1 Witkin Summary Cal. Law (10th ed. 2005) Contracts, § 117, p. 156.)

""""Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." [Citations.]' [Citation.]" 'Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed. But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide.' [Citations.]" (*HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100, 1109.) The surrounding circumstances are relevant in determining whether a binding contract has been formed, and even a letter of intent can constitute a binding contract, depending on the expectations of the parties. (*California Food Service Corp. v. Great American Ins. Co*. (1982) 130 Cal.App.3d 892, 897.)

It is undisputed that on March 24, 2010, plaintiffs offered to Alliance United to settle their bodily injury claims. Plaintiffs' March 24, 2010, letter offered to settle their claims for policy limits of $15,000 per person, $30,000 maximum for each accident.

8

Plaintiffs' counsel stated during trial that plaintiffs' March 24, 2010, letter was an offer to settle plaintiffs' bodily injury claims. On April 1, 2010, Alliance United expressly accepted plaintiffs' offer to settle their personal injury claims for defendant's policy limits. Alliance United's April 1, 2010, letter to plaintiffs' counsel stated, "In response to your correspondence dated March 24, 2010, we have agreed to accept settlement of your client's injury claim for our insured policy limits of $15,000 per person, $30,000 maximum aggregate (per accident)."

Plaintiffs contend that the releases enclosed with Alliance United's April 1, 2010, letter contained new terms, including a release of plaintiffs' property damage claims, and therefore the release constituted a rejection of plaintiffs' settlement offer or a counteroffer such that there was no mutual assent to settle plaintiffs' claims. The releases, however, were not incorporated by reference into Alliance United's April 1, 2010, letter. In addition, "Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole. [Citations.] Where all of the essential terms of an agreement are definitely agreed upon in the writing there is a binding contract even though there is an intention that a formal writing will be executed later. [Citations.] The intent of the parties is to be determined by an objective standard and not by the unexpressed state of mind of the parties. [Citation.]" (*Smissaert v. Chiodo* (1958) 163 Cal.App.2d 827, 830.)

"Where the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one' the failure to follow it with a more formal writing does not negate the existence of the prior contract. [Citation.]" (*Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307.) "'"Any other rule would always permit a party who has entered into a contract like this, through letters and telegraphic messages, to violate it, whenever the understanding was that it should be reduced to another written form, by simply suggesting other and additional terms and conditions. If this were the rule the contract would never be completed in cases where, by changes in the market, or other events occurring subsequent to the written negotiations, it became

9

the interest of either party to adopt that course in order to escape or evade obligations incurred in the ordinary course of commercial business. . . . If the parties did not become bound in this case they cannot be bound in any case.'" [Citation.]" (*Stephan v. Maloof* (1969) 274 Cal.App.2d 843, 848-849.)

The essential terms "of [the] agreement [were] definitely agreed upon" (*Smissaert v. Chiodo*, *supra*, 163 Cal.App.2d at p. 830) here, as established by the March 24, 2010, offer letter and the April 1, 2010, acceptance letter. The parties agreed to settle plaintiffs' bodily injury claims for defendant's policy limits of $15,000 per person, $30,000 maximum for each accident, and as conceded by plaintiffs' counsel, Alliance United, an insurance company, is "entitled to get a release of the claim that they are settling."

In addition, Alliance United's April 1, 2010, letter links the return of signed releases and a W-9 tax form to the timing of the payment of the agreed upon settlement amount of $30,000 to be paid to plaintiffs. The April 1, 2010, letter states, "We will send the settlement draft out to you on the next business day after receiving the signed release[s] and your [W-9 Request for Taxpayer Identification Number and Certification] form." A reasonable person would conclude that the parties did not intend that the agreement must be reduced to release agreements in order for the agreement to be binding on the parties, or that the terms and signing of the release was a condition of acceptance of the policy limits to settle plaintiff's bodily injury claim. Instead, a reasonable person would conclude that the releases were for implementing the settlement and a mechanism governing the timing of the payment of the settlement proceeds to plaintiffs. Because we conclude that the March 24, 2010, letter and the April 1, 2010, letter, the parties entered into an agreement to settle plaintiffs' bodily injury claims, we do not reach plaintiffs' contention that the trial court erred in admitting evidence concerning Jethwa's intent in sending the April 1, 2010, letter and the enclosed releases, and his mistake in including in the attached releases a release of plaintiffs' property claims.

We recognize that generally parties to a contract are bound by the express language they use, and if an offeree makes a mistake in the attempted acceptance, there

10

may not be a binding contract. (2 Williston on Contracts (4th ed. 2007) § 659, pp. 857-858.) Here, however, the actual acceptance was unequivocal. The only problem was with the form release enclosures. Often parties settle a case without a binding release. (See, e.g., *Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 49 ["The necessity of bankruptcy court approval for a release in a settlement agreement does not foreclose the ultimate enforceability of the settlement agreement'].) That in effect was what occurred here.

Even if we were to go beyond the March 24, 2010, and April 1, 2010, letters to determine if the parties entered into an agreement, there is an ambiguity as to whether the terms of Alliance United's response to plaintiffs' settlement offer was a release of plaintiffs' bodily injury claims, as stated in the April 1, 2010, letter, or a release of plaintiffs' bodily injury and property damage claims, as stated in the releases. A stated above, "'Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed.' . . . [Citations.]" (*HM DG, Inc. v. Amini, supra,* 219 Cal.App.4th at p. 1109.) The surrounding circumstances are relevant in determining whether a binding contract has been formed. (*California Food Service Corp. v. Great American Ins. Co.*, *supra,* 130 Cal.App.3d at p. 897.) As conceded by plaintiffs' counsel, there were never any prior settlement discussions concerning property damage. It is reasonable for the trial court to conclude, as it did, that despite the conflicting terms used in Alliance United's April 1, 2010, letter and the enclosed releases, the parties intended to settle plaintiffs' bodily injury claims only.

Plaintiffs contend that the releases enclosed with the April 1, 2010, letter contained terms not specifically included in the April 1, 2010, letter that are in addition to a release of plaintiffs' property damage claims. These terms include a waiver of the rights Civil Code section 1542, and an agreement to indemnify defendant, Janet Escobar and Luis Escobar, and their insurer or insurers and attorneys, for any lien claims made against the proceeds of the settlement. Plaintiffs contend that these terms constituted a rejection of plaintiffs' settlement offer or a counteroffer such that there was no mutual

11

assent to settle plaintiffs' claims. Those terms, however, are of the type that parties would reasonably expect to be included in a settlement of claims arising out of an automobile accident and, therefore, "applying reasonable meaning [to the] words and acts of the parties," the parties intended to settle plaintiffs' bodily injury claims. Those terms did not constitute a rejection of plaintiffs' settlement offer or a counteroffer.

**DISPOSITION**

The judgment is affirmed. Defendant is awarded his costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MOSK, J.


We concur:


TURNER, P. J.


MINK, J.*

---

*      Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.